110　173
d121　52

## DIXON *v.* CENTRAL OF GEORGIA RAILWAY CO.

1. The test of distinction between "transportation" service relatively to loaded freight-cars for which a railway company can lawfully charge tonnage rates, and "switching" or "transfer" service for which it is restricted to a fixed charge per car, is not whether the movement of the cars involves the use of a portion of the company's main line, or that of another; for there may be a transportation service over one or more spur-tracks of the same company, if the contract of affreightment requires no movement over other tracks or lines of railway; whereas a switching or transfer service is one which pre-

cedes or follows a transportation service, and applies only to a shipment on which legal freight charges have already been earned, or are to be earned.

2. Parol evidence is admissible to explain the meaning of the terms "transportation," "switching," and "transfer," as applied to railroad operations.

3. A contract between a city and a railway company for reduced freight rates upon goods transported by the company for the municipality does not inure to the benefit of one under contract with the city to deliver to it at a fixed price supplies f. o. b. at the point of delivery.

4. Though a person who had contracted with a city to furnish it with coal for use in running a system of waterworks became the head of the water commission of such city, he could not, because of his official position as such, avail himself of the terms of a transportation contract between the city and a railway company, whereby the former had secured reduced freight charges upon goods or supplies hauled for its benefit.

5. The relation of shipper and carrier does not begin between the owner of goods and a railway company, though the former may have delivered the goods to the latter, if after such delivery anything required either by law or the contract remains to be done by the shipper; and in such case the rights and liability of the company are those only of a warehouseman.

6. Where goods to be shipped are situated upon a spur-track of a railway company, and the owner has no track scales, thus rendering it necessary to move the loaded cars to the company's depot for the purpose of weighing the same, so as to ascertain the proper amount of freight charges, the delivery of such cars will be treated as having been made to the company at such depot.

7. When such a delivery is in fact made, and the shipper refuses on demand to pay the proper freight charges, and the goods are left in the custody of the company, it has a lien upon such goods for proper storage charges, whether they be left in the cars or removed into a warehouse.

8. Where several cars are left in the custody of a railway company under such conditions as those just indicated, the company may retain possession of the goods in all of them until its just charges are paid.

9. While the motion for a new trial contained a large number of grounds, the principles of law above announced are controlling in this case, and, upon the merits, the evidence demanded the verdict.

Argued February 17, — Decided March 2, 1900.

Foreclosure of lien. Before Judge Falligant. Chatham superior court. August 2, 1899.

*Saussy & Saussy,* for plaintiffs in error.

*Lawton & Cunningham* and *T. M. Cunningham Jr.,* contra.

Lewis, J.　On the first day of August, 1898, the Central of Georgia Railway Company instituted, under the Civil Code, § 2816, proceedings to foreclose a lien on four cars of coal received by it from the defendants, C. H. Dixon & Co., agents, on June 7, 1898.　It was claimed in the affidavit of foreclosure that this coal was received by the company at its place of business in the City of Savannah, to be shipped to the waterworks in said city, for which the defendants refused to pay the regular rate of seventeen and one half cents per ton, demanded by the company, and since the date of their receipt the four cars of coal have been in its possession as a depositary for hire in its yard in the City of Savannah.　The proceedings were for the purpose of foreclosing a lien claimed by the company as a depositary for hire.　It was further alleged in the affidavit of foreclosure, that these cars of coal were received by the company with the understanding that Dixon & Co., agents, would prepay any freight charges thereon, which they refused to do.　Fi. fa. was issued upon this affidavit of foreclosure, and levied upon the coal.　To this proceeding C. H. Dixon, trading under the name of C. H. Dixon & Co., agents, filed an affidavit of illegality on several grounds embracing substantially the following as defenses:　1st. It did not appear from plaintiff's affidavit it had completed its contract of shipment so as to entitle it to any lien for freight charges.　2nd. The place of shipment was the waterworks, and it did not appear that there was any delivery of the freight tendered at the place of destination.　3rd. The charge in the proceedings for foreclosure was for storage, while the bill of particulars attached thereto was for demurrage, for which charge there is no lien prescribed under the statute.　4th. The company had no lien on the property levied upon.　5th. The amount set forth in the affidavit of foreclosure, or any part thereof, was not due.　6th. Plaintiff received the cars from the place of business of defendant on River street under a contract to deliver the same as per consignment to the City of Savannah at the wharf of said railroad, at the end of River street in said city; and before any charges could accrue against the shipment defendant tendered to plaintiff the cost of trackage along River street, the usual and customary charge for such service, and a

charge regulated under the ordinances of the City of Savannah, to wit, one dollar per car. The company operates the line on River street for purposes of transfers, said track being no part of the main stem of the railway. This defendant, in behalf of the City of Savannah, and under authority of the chairman of the waterworks commission, which has control of the Savannah waterworks, accepted the freight at the wharf of plaintiff, and ordered the freight transferred to the Savannah waterworks, and tendered plaintiff the sum of one dollar per car, being the rate for such transfer. Plaintiff refused the tender, and retained possession of the goods unlawfully. It is further claimed in the affidavit of illegality that the rules of the Railroad Commission of Georgia provided that the failure of a railroad company to deliver freight entitles the shipper to recover damages at the rate of one dollar per car, and this was pleaded as an offset. It was the duty of the plaintiff to deliver the freight to the Florida Central and Peninsular Railroad Company, with which company it had a contract concerning transportation of freight for said waterworks, whereby the last-named company was to haul all freight to said point without charge, inasmuch as the spur-track leading from the main line of the plaintiff to the waterworks was used in part by the Florida Central and Peninsular Railroad Company as a means of approach to the depot in the City of Savannah.

It also alleged that the waterworks were not situate on the main line of plaintiff's railway, nor upon any connecting road, so as to enable plaintiff to charge regular freight rates for transportation; but the waterworks were situate on a spur-track built by the City of Savannah, and by it turned over to plaintiff's predecessor upon express condition that all freight consigned to said city at the waterworks should be hauled and delivered at the rate of one dollar per loaded car as trackage; and the waterworks not being upon the main line of plaintiff, nor upon the line of any other railroad or station, or public place for delivery of freight, and being within three miles of plaintiff's wharf and the wharf of defendant, said waterworks stand upon the same footing as warehouses and factories, and plaintiff, upon com-

pletion of its contract of affreightment, was not entitled to charge any more than the rate allowed by law for trackage.

It substantially appears from the evidence in the record that C. H. Dixon & Co., agents, were coal merchants, whose place of business was on River street adjacent to the River street track of the Central Railway. Dixon & Co. had a contract with the water commissioners of the city of Savannah to deliver coal f. o. b. cars at the waterworks, which was about two miles out of the city, and connected with the terminals of the Central by a track known as the waterworks track. This last track was also owned by the Central, which laid the same on the land belonging to the city, and upon completion of the waterworks the track and roadway were ceded by the city to the Central, and a contract was entered into between them "that the trackage charge to the city shall not exceed the sum of one dollar per loaded car for all cars received from or delivered to the said city on said spur-track." It seems this track was under lease to the Florida Central and Peninsular Railroad Company, being the track on which its railroad entered the city, but it was agreed in the lease that railroad would switch the cars of the Central of Georgia "to and from the waterworks, and such other industries as may be located thereon, over said track free of compensation, and as promptly as their own similar service is performed, and when so engaged the agents and servants of the Florida Railroad shall be considered as servants of the Central Railroad." It would seem, therefore, as to this case, the waterworks track may be treated as substantially the track of the Central of Georgia Railway. C. H. Dixon & Co. was a firm composed only of C. H. Dixon, who became insolvent a few months before the time of this shipment. Pending the incorporation of a company which was to be known as the " C. H. Dixon Company," the incorporators of which were the said C. H. Dixon and his two brothers, M. W. and James M. Dixon, the business formerly conducted by the defunct firm passed into the hands of C. H. Dixon & Co., agents, who assumed the contract with the waterworks commissioners to deliver coal free on board cars at the waterworks. C. H. Dixon ran the business of Dixon & Co., agents, whereof his brother, J. M. Dixon, was the principal. J. M. Dixon was

12

surety for the faithful performance of the contract of Dixon & Co. with the waterworks commission, and he was also chairman of the waterworks commission, a body created by the legislature. (See Acts 1895, p. 300.) That act provided that an oath of office be taken by each member of the commission, which was duly taken by J. M. Dixon, as follows: "I swear that I will not be concerned or interested, pecuniarily, in any way . . in any contract for the purchase of property or supplies for said waterworks, while a member of said board."

C. H. Dixon & Co., agents, were not on the credit list of the Central of Georgia Railway, and the prepayment of freight was always exacted. The rate which the Central had uniformly charged for shipments of coal from any point on the River street track to the waterworks was 17 1/2 cents a ton. The railroad commission rate for a distance of five miles and under was 35 cents per ton. The distance from Dixon's wharf to the waterworks is 2.64 miles. In 1896 C. H. Dixon and H. M. Comer, who was then receiver of the Central, by contract, made the rate of freight between these points at 17 1/2 cents a ton, which seems to be half of what the law permitted the Central to charge. For an ordinary transfer or switching service on the River street track the railroad's charge was uniformly $1.00 per car. It appears from the evidence that these rates were uniformly charged and paid by Dixon & Co., agents, who had shipped a number of cars under their contract with the Central; and that they paid these charges without any objection whatever up to the time of the shipment in question. Dixon & Co., agents, had no track scales at their wharf, and the only way in which the amount of freight could be determined, if the tonnage rate applied, was to weigh the cars on the track scales in the Central Railway yards. The four cars in question were, on this account, loaded with coal on the River street track adjacent to Dixon's place of business, for the purpose of being shipped to the waterworks. The Central took the cars up to its yard, weighed them, sent the weights to Dixon & Co., agents, with a bill for $17.20, freight charges, that being the amount at the rate of 17 1/2 cents per ton; and the shipper, instead of sending that amount, sent the Central a check for $8.00, or $2.00

per car. This the Central refused to accept. It seems the shipper thereupon complained to the city that the Central had violated its contract with the city, and would not transfer the cars from the wharf to the waterworks for $1.00 per car. The city declined to grant the relief sought by the shipper, and replied that, his contract being to deliver coal f. o. b. cars at the waterworks, it was a matter of indifference to the city how much freight the shipper paid. It appears from the evidence that J. M. Dixon was the principal actor in this matter for C. H. Dixon & Co., agents, and that he was also chairman of the water commission. A letter was written by them to the agent of the Central at its wharf, consigning the cars to the city of Savannah, for which they made a tender of $1.00 per car for River street trackage. J. M. Dixon, as chairman of the commission, also wrote a letter to the agent of the Central, instructing him to transfer to the waterworks, in accordance with the agreement between the city and the railway, at $1.00 per car, the coal which had been consigned to the city at the Central wharves, thus making the rate from Dixon's wharf to the waterworks only $2.00 per car. It further appears from the record that J. M. Dixon did not consult any member of the board of the water commission about writing the letter, and that the money he tendered came out of his own pocket. The shipper having declined to pay the rate demanded, the cars remained where they were when the difference arose between the parties; and the railway assessed charges for storage, and foreclosed its lien as a depositary for hire.

1. The vital question in this case, and one upon which its determination mainly depends, is whether or not the service for which the railway was charging the shipper of this coal was " transportation " service, or "transfer" or "switching" service. It appears from the record that an appeal was made by the plaintiff in error to the railroad commission, by which proceeding it was sought to get the railroad commission to enforce in this matter its rule No. 25, in language as follows: "A charge of no more than two dollars per car will be allowed for switching or transferring a car from any point on any road to any connecting road or warehouse within a space of three miles

from starting point, without regard to weight or contents."
From the facts in the record it appears that this rule manifestly
applies to what is known as "switching" or "transfer" service;
and it was claimed by counsel for plaintiff in error that it was
applicable to this case, where it was purely a transfer service,
as the shipment of the goods was confined to what is known as
spur-tracks of the railroad. On the other hand, it was con-
tended by counsel for defendant in error that that rule had no
application whatever to this service, for transfer or switching
service only relates to the removal of cars over spur-tracks after
they have reached the terminal point of some railroad line, and,
without being unloaded, are transferred on a spur-track usually
to the place of business of the consignee. It is therefore con-
tended that switching service applies only in cases where there
necessarily preceded or succeeded such service the payment of
freight for transportation over some line of railway. From
this contention it would follow, for example, that if Dixon & Co.
had ordered freight over the Central to be shipped to Savannah
from Macon, Ga., they would be liable for regular rates of
transportation from that point to the railway terminal at Savan-
nah; and the Central, in shipping the freight from its depot
over the spur-track to Dixon & Company's place of business,
would simply be entitled to the rates fixed for such transfer
service. Or, if Dixon & Co. desired the Central to transport
freight from their place of business in Savannah to Macon, and
the Central transported the goods over its spur-track from the
shipper's place of business to its depot, it could only charge
additional, for this part of the transportation, simply the
switching-service rate. We think the case is quite different
when the shipment of freight is entirely confined to such spur-
tracks. The uncontradicted evidence shows that the necessary
expense for such a shipment could not be met by payment of the
small rate prescribed for a transfer or switching service, and
these small rates are chargeable only in cases where revenue is
derived for transporting the freight over a railway, which must
either precede or follow the service rendered on the spur-track.
In this case the contract of carriage involved a transportation
from Dixon's wharf to the waterworks. That constituted the

entire service, and the fact that the entire service was rendered on spur-tracks of a railway company we do not think prevents it from being transportation pure and simple.

It appears from the record that the shipper in this case appealed to the railroad commission to enforce its rule No. 25, above quoted, and that after hearing the application the commission decided that the shipper was not entitled to the relief sought, and that the service rendered by the Central in the case was really for transportation, and hence it had the right to make the charge in accordance with the rule of the railroad commission, which allowed for the transportation of freight over routes under five miles a rate of 35 cents per ton. In the present case the Central only charged half this sum. It does seem that this decision of the railroad commission in this identical case should operate as conclusive evidence of the reasonableness and legality of the charge exacted by the Central against the shipper. Section 2189 of the Civil Code provides: "The commissioners shall make reasonable and just rates of freight, and . . shall make reasonable and just rules and regulations, to be observed by all railroad companies doing business in this State, as to charges at any and all points for the necessary handling and delivering of freights." And under section 2190 of the Civil Code it is provided that in suits brought against such corporations the commission's schedules of rates shall be deemed and taken in all the courts of this State as sufficient evidence that the rates therein fixed are just and reasonable rates of charges for transportation. Even if the construction the commission has placed upon its own rule is not conclusive upon the parties, it certainly should receive great weight, under the law, with the courts. But, in addition to this, a quantity of evidence was introduced in behalf of the Central Railway Co., by witnesses expert in railroad business and familiar with the meaning of certain terms used in connection with such business, who defined what was meant by transportation, and switching service, and distinguished the difference exactly in accord with the contention of counsel for defendant in error in this case. We therefore think, in the light of all the evidence in the record, that the service undertaken by the Central in this case was purely trans-

portation service, and that the rates with reference to transfer or switching cars over spur-tracks had no application whatever.

2. Error is assigned in the motion for a new trial upon the admission of parol evidence for the purpose of explaining the meaning of the terms "transportation," "transfer," and "switching," as-applied to railroad corporations. This question involves the construction of words used in connection with a particular subject-matter. Experts in the business were offered as witnesses to testify as to their common acceptation and usage when applied to the operation of railroad companies. We think the Political Code, § 4, par. 1, settles the question. It declares: " The ordinary signification shall be applied to all words, except words of art, or connected with a particular trade or subject-matter, when they shall have the signification attached to them by experts in such trade, or with reference to such subject-matter." See also Civil Code, § 3675, par. 2, where it is declared: "Words generally bear their usual and common signification; but technical words, or words of art, or used in a particular trade or business, will be construed, generally, to be used in reference to this peculiar meaning. The local usage or understanding of a word may be proved in order to arrive at the meaning intended by the parties." See also 1 Greenleaf on Evidence, § 280, where the principle of allowing parol evidence in such cases is clearly recognized.

3, 4. It was further insisted in behalf of plaintiff in error that the contract between the City of Savannah and the Central, for reduced freight rates upon goods transported by the company for the municipality, was binding upon the former in this case, and that it could not charge for the service of this transportation from the depot to the waterworks any more than the price stipulated in that contract, $1.00 per car. It is manifest from the evidence in the record that this contract between the Central and the city had nothing whatever to do with the contract between the parties to this case. The contract made with the city had direct reference only to such goods as were consigned to the city, and for the payment of which the municipality itself was liable. In this case the shippers were under contract with the water commission of Savannah to deliver to it coal f. o. b. the cars at the waterworks. It is true that the active

manager of the business of Dixon & Co., J. M. Dixon, was also chairman of the water commission. He adopted the scheme of writing a letter to the agent of the Central, instructing him to transfer to the waterworks the coal which had been consigned to the city, but he had no authority whatever for giving such direction. It was certainly never authorized by the city itself through its officials, nor was it authorized by any resolution or other action taken by the board of water commissioners. On the contrary it appears that he intended to make the payment himself out of his own pocket, and that it was in no wise a charge upon the city. When he made his appeal to the municipal authorities of the city, they gave the same construction of this contract as was adopted by the Central, and declined to grant any relief whatever.

5, 6. It was further contended by counsel for plaintiff in error, that the railway company in this case occupied the position of a common carrier; that it had failed to comply with its obligations to transport the goods to their destination; that it never occupied the position of a warehouseman, and, therefore, had no lien upon the property for storage. It was further contended that the duty devolved upon the company, unless it intended to transport the property to its destination, to reship it to the consignor, and that the company had no right to hold the same, and thus accumulate against the shipper charges for storage. Under the facts of this case we do not think there is any question that the company occupied the position of a warehouseman. It is true the goods had been transferred from the place of business of the shipper to the company's yards, but that was absolutely necessary in order to determine what would be a proper charge for transportation. There was no means of weighing the cars at the shipper's place of business where they were loaded. This weight was absolutely necessary in order to determine the amount of freight; and hence they had to be transferred to the company's yards for this purpose. We think, therefore, the delivery of the cars should be treated as having been made to the company at its depot. Under the contract between the carrier and shipper in this case, a prepayment of the freight was required before any obligation rested upon the carrier to transport the goods to their destination. This the ship-

per wrongfully refused to pay; and clearly the duties of the company as a common carrier did not begin, although the delivery of the goods for shipment had been made, as long as anything remained to be done by the shipper himself. In 5 Am. & Eng. Enc. L. (2d ed.) 261, the author says: "The rule, broadly stated, is that if, after the delivery of the goods for shipment, anything remains to be done by the shipper, the liability of the carrier as insurer does not attach and it is responsible only as a warehouseman." In the case of Barron v. Eldredge, 100 Mass. 458, Colt, J., in discussing this subject, says: "The responsibility of a common carrier, for goods intrusted to him, commences when there has been a complete delivery for the purpose of immediate transportation. .. . The delivery must be for immediate transportation, and, of course, it can not be complete if anything remains to be done by the shipper before the goods can be sent on their way." The same principle is announced in Hutchinson on Carriers, § 63. It is therein stated that one is not chargeable as a carrier, but merely as a warehouseman, until the shipper has complied with every duty upon him, which it was necessary for him to discharge before shipment; and the author thus illustrates: "as where the goods are deposited without instructions as to their place of destination, either by marks or otherwise, or to await orders, or until the charges for the transportation are paid, if that is required by the carrier, or if anything remains to be done or any expense to be incurred to put them in a condition to bear transportation." While the company, therefore, retained this property on board its cars at its depot, on account of the failure of the shipper to comply with the conditions precedent to its shipment, it occupied, as to him, the position of a warehouseman. There is nothing in the contention that the company should have returned the property to the consignor. He made no demand therefor. On the contrary, he insisted upon the company transporting the goods to their destination, without complying with his obligations under the contract. The position of the company, therefore, was lawful; and it had a right to charge storage for this purpose. The fact that the goods were stored in its cars instead of a warehouse did not change the company's position as a depositary for hire. *Miller* v. *Ga. R. Co.,* 88 *Ga.* 563.

7. It appears that the Central Railway adopted rule 4, section 2, of the car-service rules, which is in the following language: "On cars placed for loading, free time will expire forty-eight hours from the time the loading of car commences, and car-service charges will continue on - same until shipping instructions are given, and bill of lading taken out." In accordance with the power conferred upon the railroad commission by the Civil Code, § 2206, to prescribe a schedule of maximum rates and charges for storage of freight, the commission has passed rules known as demurrage rules, regulating charges for storage of goods in cars, which rules are similar to the car-service rule above quoted. The rates charged by the Central in this case were within the limits prescribed by those regulations. The term "demurrage," as used in its technical sense, applies to maritime law, and some authorities have held that it is confined to carriers by water; but it is evidently, under these rules of the commission, and by railroad companies, not used in its technical sense. It was no doubt adopted as a convenient term, as contended by counsel for defendant in error, to represent the storage of goods in cars, as distinguished from the storage in warehouses. The right to charge for such storage in cars arises when the goods are necessarily detained by virtue of the failure of the shipper to comply with his obligations to the carrier. The company is, in this way, deprived of the use of its cars; and even if the rules adopted in this particular case as to such charges did not apply, they would still be entitled to reasonable charges as a warehouseman, or as a depositary for hire. In 28 Am. & Eng. Enc. L. 667, it is stated: "In the absence of a special agreement as to charges, the law implies a contract to pay a reasonable compensation." In Elliott on Railroads, § 1567, that author, in discussing this subject, says: "While it is probably true that this right [of demurrage] is derived by analogy from the maritime law as administered in America, the more recent authorities have almost unanimously upheld the right of railroad companies to make demurrage charges in proper cases." The author then quotes the following observation from the decision of this court in *Miller* v. *Georgia R. Co.*, 88 *Ga.* 573: "We see no satisfactory reason why carriers by

railroads should not be entitled to compensation for the unreasonable delay or detention of their vehicles, as well as carriers by sea." On the same line see Norfolk & W. R. R. *v.* Adams, 90 Va. 393, 18 S. E. Rep. 673; Ky. Wagon Co. *v.* Ohio Ry. Co., 98 Ky. 152, 32 S. W. Rep. 595; 9 Am. & Eng. Enc. L. (2nd ed.) 261.

It is insisted by counsel for plaintiff in error, that even conceding the railway company had a right to make charges for storage of goods, it had, by operation of law, no lien upon the property itself. If we are correct in the conclusion that the defendant in error occupied the position of a warehouseman, then, under the laws of this State, it has a lien upon the property, and can retain possession thereof until it is paid. Section 2928 of the Civil Code declares: "Depositaries for hire are bound to exercise ordinary care and diligence, and are liable as in other cases of bailment for hire; they have a lien for their hire, and may retain possession until it is paid." Section 2930 declares: "A warehouseman is a depositary for hire, and is bound only for ordinary diligence," etc. The right of the retention of goods by a carrier for charges for freight and storage, even when the property is stored upon cars, was virtually recognized by this court in *Pennsylvania Steel Co. v. Georgia R. Co.,* 94 *Ga.* 636. In that case it appeared that tons of rails, spikes bolts, etc., had been shipped in car-load lots, which came into the possession of the defendant railroad company as the last connecting line. From each consignment the defendant retained one or two cars to secure itself for the freight and demurrage it claimed on such consignment, and delivered to the consignee the rest of the cars. It was held in that case that payment of the freight and storage must be made before the consignor can obtain possession. In *Miller* v. *Georgia R. Co.,* 88 *Ga.* 563, this right of a carrier to collect its reasonable charges for storage in its cars was clearly recognized. In that case it seems the same rate was charged by the railroad company as in the case at bar; and it was there held that the fact that this regulation was promulgated by a board of persons representing a combination of such carriers made no difference. On page 571, Simmons, Justice (now Chief Justice), stated in his opinion

the following: "We do not think it material, as affecting the right to make a charge of this character, that the goods remain in cars instead of being put into a warehouse." This right of the retention of the property to enforce its lien is recognized in Ky. Wagon Co. v. Ohio Ry. Co., 98 Ky. 152, 32 S. W. Rep. 595; and also by the following language in 4 Elliott on Railroads, §1567, p. 2439: "It was held in the cases cited in the first note to this section that a railroad company can have no lien for demurrage charges, but, as we have seen, those cases deny in toto the right to charge for delay or detention of cars, in the absence of a contract, and, to that extent at least, are contrary to the weight of authority. In several of the cases which assert the right to charge demurrage it is expressly held that the company may have a lien for such charges, and in others there are intimations to the same effect."

Counsel for plaintiff in error cite some authorities in conflict with this view. Among them attention is called to 9 Am. & Eng. Enc. L. (2nd ed.) 270, where it is stated: "By the weight of authority a railroad company has no lien on goods shipped, for demurrage or damages in the nature of demurrage, for delay in unloading the same and consequent detention of cars or other property, unless a lien is given by contract or by statute." The author cites a few cases in support of the text, and makes no reference to the decided weight of authority to the contrary, including the decision of our own court in *Miller* v. *Georgia R. Co.*, 88 *Ga.* 563. Besides, as above indicated, we think the statute of Georgia does give a lien which necessarily follows upon the relation of warehouseman that the company in this case sustained to the owner of these goods.

8. Counsel for plaintiff in error contended in the motion for a new trial and bill of exceptions, and also in the argument, that the Central had no right to retain the whole shipment for the payment of its charges; and that the question of reasonableness or unreasonableness of so doing was improperly withheld by the court from the jury. It was urged that the value of the coal on one car would have been amply sufficient to meet these charges; and that the other three should have been delivered at the place of destination. All four cars were delivered

under one entire contract, and we think section 2928 of the Civil Code gives the right to retain possession of the entire property thus stored until the charges for such storage are paid. The case of *Pennsylvania Steel Co.* v. *Georgia R. Co., 94 Ga.* 636, is cited in behalf of plaintiff in error, as authority for his contention. In that case it appeared that the railroad company did not retain all the cars, but only a portion of them; and it was contended by the Pennsylvania Steel Company that each car constituted a separate shipment, and the amount due on each was readily ascertainable, and that the defendant, in delivering the freight, departed from its general custom requiring cash before delivery. A demurrer to the declaration was sustained, which was affirmed by this court. There is no indication whatever that the railroad company did not have an equal right to retain all the cars instead of a portion thereof. In 28 Am. & Eng. Enc. L. 663-4, the author recognizes, as accompanying the lien of a warehouseman on property stored with him, the right to retain possession of the goods until satisfaction of the charges imposed upon them. Under that text a number of authorities are cited. Morgan *v.* Cogdon, 4 N. Y. 552; Schmidt *v.* Blood, 24 Am. Dec. 145; Barker *v.* Brown, 138 Mass. 340.

In view of the above principles, it is quite manifest that the claim of offset made by the plaintiff in error to the foreclosure of this lien was properly not submitted by the court to the jury. The demurrage or storage charges that had been running against the shipper in this case could have been readily prevented by paying the freight charges demanded by the carrier, and the unfortunate position in which the shipper was placed by such detention was the result of no legal wrong whatever done him by the carrier, but was caused by the shipper's failure to comply with the legal obligations under his contract. Of course, therefore, the shipper had no legal claim against the company for the detention of his property.

9. The motion for a new trial contains a large number of grounds not specifically set forth in this opinion. These grounds, about 35 or 40 in number, are subdivided, many of them, into distinct points of law made thereon, making the several charges

of error complained of amount in numbers to some 80 or
90. In the above treatment of this case, however, we think the
principles enunciated cover every point worthy of any consid-
eration whatever, involved in the writ of error; and those de-
cided are certainly controlling in this case. Applying these
principles to the testimony introduced upon the trial, our con-
clusion is that the evidence demanded the verdict. We will
take this occasion to remark that, in the investigation. of the
principles of law controlling this case, we have been materially
aided, and our work greatly facilitated, by the condensed but
thorough brief of learned counsel for defendant in error.

*Judgment affirmed. All the Justices concurring.*