(69 South. 161)

No. 20664.

VICKSBURG, S. & P. RY. CO. v. RAILROAD COMMISSION OF LOUISIANA.

(May 10, 1915. Rehearing Denied June 28, 1915.)

*(Syllabus by the Court.)*

1. CARRIERS ☞189 — PREFERENTIAL RATES — UNFAVORABLE LOCATION.

There is no rule, of reason or of law, which imposes upon a carrier the burden of compensating, by preferential rates, the disadvantage, resulting from unfavorable location, under which either a community or a particular shipper may labor.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 162, 854, 855, 859–865; Dec. Dig. ☞189.]

2. CARRIERS ☞12 — PREFERENTIAL RATES — ORDER OF RAILROAD COMMISSION—UNFAVORABLE LOCATION.

An order of the Railroad Commission, which throws upon one carrier, of several, the entire burden of putting an unfavorably situated place on a parity, as to freight rates, with a place that is favorably situated, declares certain handling of freight cars, between different stations, which is necessary to the delivery of the freight at its destination, to be "switch movements," and fixes a flat rate therefor, which is below the cost of the movement, is unreasonable, and is properly annulled.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. ☞12.]

3. CARRIERS ☞189 — THROUGH SHIPMENT — RATES.

Where freight is received for transportation, and delivered by the same carrier, or by a connecting carrier, who is a party to a through contract, the charge for transportation and delivery is largely regulated by the character of the commodity; and as some classes of goods are more valuable and involve greater responsibility, and some are more difficult to handle and involve greater expense, than others, the charge for carriage, handling, and delivery is determined accordingly, and includes the entire service. But there is no rational theory upon which one of the carriers, in any such case, can be entitled to the highest rate, and another be required to accept the lowest.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 162, 854, 855, 859–865; Dec. Dig. ☞189.]

4. CARRIERS ☞193—CONNECTING CARRIERS—THROUGH SHIPMENT—SWITCHING SERVICE.

Switching service, as between railroad companies, is usually reciprocal, and it is inconceivable that, when a particular company has hauled a car load of high class freight to the end of its road, it should have the right to require a connecting company to continue the haul and deliver the car at its ultimate destination, as a switch movement, at a fixed price, without regard to the character of the contents of the car; and especially is that true where there is no possibility of its rendering a reciprocal service to such connecting company.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 348, 868, 869; Dec. Dig. ☞193.]

5. CARRIERS ☞12 — TERMINAL FACILITIES — CHARGES—REASONABLENESS.

It is unreasonable to suppose that a railroad company can afford to acquire extensive terminal facilities, build, maintain, and operate a drawbridge, at an original cost of $276,662.70, and an annual expense exceeding $2,000, and charge no more for the use of such facilities, in the loading, unloading, and handling of cars, than for ordinary switching operations upon a track costing $11,000 per mile.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. ☞12.]

Appeal from Twenty-Second Judicial District Court, Parish of East Baton Rouge; H. F. Brunot, Judge.

Action by the Vicksburg, Shreveport & Pacific Railway Company against the Railroad Commission of Louisiana. From judgment for plaintiff, defendant appeals. Affirmed.

Ruffin G. Pleasant, Atty. Gen., and Wylie M. Barrow, Asst. Atty. Gen., for appellant. Stubbs, Russell & Theus, of Monroe, for appellee.

MONROE, C. J. Defendant has appealed from a judgment decreeing illegal and unreasonable, and prohibiting the enforcement of, its "order No. 1498," for the handling of certain cars between Monroe and West Monroe, in the parish of Ouachita, and declaring such handling to be "switch movements." The objections which plaintiff makes to the order are that it operates a taking of its property without due process of law, and purports to establish a rate, as "for switching," unreasonable in itself, and which relates to a movement that is, in no proper sense, a "switch movement," but is a "line haul," from one municipal corporation and railroad station to another.

Plaintiff is a Louisiana corporation, which owns a railroad that extends across the northern part of the state and passes through Monroe and West Monroe, two distinct municipalities, lying, respectively, on the east and west bank of the Ouachita river, and having each a railroad station, with its agent and other employés, yards, and terminal facilities. The station at Monroe was established, by the former owners of the road, many years ago, and the station at West Monroe, a smaller place, of later origin, was also established by the former owners in 1893 or 1894. Plaintiff acquired the road in 1901; and in 1903 (by which time the St. Louis, Iron Mountain & Southern Railway, called the "Iron Mountain," appears to have been extended into Monroe, but not into West Monroe) the following agreement and order were entered into and issued; to wit:

#### Agreement.

"New Orleans, La., October 10, 1903.

"On authority of the Railroad Commission of Louisiana to withdraw switching rates between Monroe and West Monroe, La., the Vicksburg, Shreveport & Pacific Railway Company will make the following rates:

"First. Same rates to and from competitive points to be given to West Monroe as in effect to and from Monroe.

"Second. The rate of $5 per car, marked capacity, to be made on lumber, West Monroe to Monroe, when for local points on St. Louis, Iron Mountain & Southern Railway or for company's use of that line.

"Third. Rate of $3 per car from Monroe to West Monroe on cotton seed car loads, from Iron Mountain Railway, Monroe, to Union Oil Company, West Monroe.

"Fourth. Rate of $5 per car on cotton seed products from Union Oil Mill at West Monroe to Iron Mountain Railway at Monroe; it being understood that the shipments of cotton seed products from the oil mill at West Monroe to Monroe will not exceed 50 per cent. of the seed brought in over the Iron Mountain Railway.

"Fifth. (a) The St. Louis, Iron Mountain & Southern and Vicksburg, Shreveport & Pacific Railway Companies agree that on lumber from West Monroe to Monroe, destined to competitive points, the V., S. & P. Railway is to receive 3 cents per 100 pounds as a division of the through rate.

"(b) That on shipments of grain and grain products and hay and other car load freight, reaching Monroe via Iron Mountain road consigned to West Monroe, the V., S. & P. Railway is to receive, as a proportion of the through rate, 2 cents per 100 pounds from Monroe to West Monroe, minimum $5 per car. [Signed by representatives of the people of West Monroe, of the St. L., I. M. & S. Ry. Co., and of the V., S. & P. Ry. Co.]"

#### Order.

"Railroad Commission of Louisiana.

"Baton Rouge.

"Order No. 307.

"At a general session of the Railroad Commission of Louisiana held at New Orleans, October 2, 1903, the Commission having under consideration a petition from the Vicksburg, Shreveport & Pacific Railway Company to cancel the $3 switching charge between Monroe and West Monroe, established by order No. 111, granted September 21, 1900, and also a supplemental petition filed by the same company asking that all switching rates between Monroe and West Monroe be canceled, the following settlement was reached:

"The parties at interest, viz., the people of West Monroe, represented by Uriah Millsaps, Esq., the St. Louis, Iron Mountain & Southern Railway Company, and the Vicksburg, Shreveport & Pacific Railway Company having reached the following agreement:

"First. Same rates to and from competitive points to be given to West Monroe as in effect to and from Monroe.

"Second. The rate of $5 per car, marked capacity, to be made on lumber, West Monroe to Monroe, when for local points on the St. Louis, Iron Mountain & Southern Railway, or for the company's use of that line.

"Third. Rate of $3 per car from Monroe to West Monroe on cotton seed car loads from Iron Mountain Railway, Monroe, to Union Oil Company, West Monroe.

"Fourth. Rate of $5 per car on cotton seed products from Union Oil Mill at West Monroe to Iron Mountain Railway at Monroe; it being understood that the shipments of cotton seed products from oil mill at West Monroe to Monroe will not exceed 50 per cent. of the seed brought in over the Iron Mountain Railway.

"Fifth. (a) The St. Louis, Iron Mountain & Southern and Vicksburg, Shreveport & Pacific Railway Companies agree that on lumber from West Monroe to Monroe, destined to competitive points, the Vicksburg, Shreveport & Pacific Railway Company is to receive 3 cents per 100 pounds as a division of the through rate.

"(b) That on shipments of grain and grain products and hay and other car load freight, reaching Monroe via Iron Mountain road consigned to West Monroe, the Vicksburg, Shreveport & Pacific Railway is to receive, as a portion of the through rate, 2 cents per 100 pounds from Monroe to West Monroe. Minimum $5 per car.

"The Commission hereby approves and sanctions the above agreement, and, as this adjustment appears to the best interests of all concerned, it is ordered that all orders or rates in conflict with the said agreement are canceled, and the said rates and agreement above written to stand in lieu thereof."

"By order of the Commission.

"Baton Rouge, Louisiana, October 24, 1903.

"Commissioners:

    "C. L. De Fuentes, Chairman.

    "W. L. Foster.

    "Overton Cade.

"[Seal.]      W. M. Barrow, Secretary."

At some subsequent period, as we infer, another road, the Louisiana, Arkansas & Gulf (called the L., A. & G.) was built into Monroe, "but the V. S. & P." (plaintiff's road) still remains the only road with rails extending into West Monroe.

In 1908, plaintiff replaced the bridge, connecting Monroe and West Monroe, with a new one, of iron, or steel, at a cost of $276,-622.70; and the different interests appear to have been satisfied with the existing freight tariff until the fall of 1912, when the defendant Commission required plaintiff to show cause why the order, here complained

of, should not be made, and gave plaintiff a hearing upon that issue. It seems, however, that no complaint had been placed of record, and no complainant appeared at the hearing; those by whom complaint had been made having been heard, informally, as we should say, at some other time and place. However that may be, the hearing accorded to the plaintiff was followed on January 16, 1903, by the "order No. 1498," which reads:

"That the Vicksburg, Shreveport & Pacific Railway Company be, and it is hereby, commanded and required to further cease and desist from charging a higher rate than the sum of $3 per car for switching service between points in West Monroe and points in Monroe on intrastate shipments to and from points in the state of Louisiana; such movements being hereby declared to be switch movements."

Under the pre-existing order (307) all freight shipped out of, or into, West Monroe, via Monroe, to and from competitive points reached by way of either of the other roads herein above mentioned, was given a through rate, which was the same as the rate out of and into Monroe, and was divided between the carrying companies, as specified in that order or as otherwise agreed on, which, in view of the fact that no other company had its rails laid into West Monroe, would appear to have been a fairly liberal concession on the part of the plaintiff, since it received no more on shipments to and from such competitive points, for the additional haul over its bridge, and the use of its terminal, at West Monroe, than it and the other roads received for the haul into and out of Monroe. As to freight shipped out of or into West Monroe, to or from noncompetitive points upon either of the other roads, there was no through rate, but each of the roads rendering service established its own rate, save in so far as the rate to be charged by plaintiff, on particular commodities, was fixed by the agreement and order.

No complaint of the operation of order 307 was made by the other roads, either before

the adoption of order 1498 or upon the trial of this case in the district court, and no such complaint was made by any shipper, as to any intrastate rate, to or from any competitive point, reached by way of either of the other roads, though one of the shippers, testifying on the trial, complained that plaintiff's charge upon one car load of ice, shipped from West Monroe to an interstate point, was higher than its charge upon another car load, previously shipped to the same point. The only dissatisfaction, then, among the parties in interest, to which the issuance of order 1498 can be attributed, seems to have arisen from the rates, established upon certain classes of freight, shipped from West Monroe, through Monroe, to noncompetitive points, beyond Monroe, upon, or reached by way of, the Iron Mountain and A., L. & G. roads; and the particular complaint, which, from the evidence in the record, we should infer, more immediately provoked the order, appears to have come from a West Monroe ice manufacturing company which is competing for business in Monroe, and desires to compete on the railroads beyond with a company established in Monroe and engaged in the same business; the idea of the West Monroe company being, apparently, that the railroad companies should be required to place it, in all respects, upon a parity with the Monroe company and enable it to use plaintiff's terminal facilities at West Monroe, the main line of its road from Monroe to West Monroe (something over a mile), its bridge over the Ouachita, and its engines and crews, and haul its product coming from or consigned to points beyond Monroe upon the same terms, or practically the same terms, as the Monroe company (which calls upon plaintiff for no service and makes no use of its property) is enabled to haul such products into and out of Monroe.

[1-3] We know of no rule, however, of reason or law, which imposes upon a carrier the burden of compensating, by preferential rates, the disadvantage, resulting from unfavorable location, under which either a community or a particular shipper may labor; and the Interstate Commerce Commission has in effect held that there is no such rule. Port Arthur Board of Trade v. A. & S. Ry. Co., 27 Interst. Com. Com'n R. 388; Sioux City Terminal Elevator Co. v. C., M. & St. P. Ry. Co., 27 Interst. Com. Com'n R. 457.

Beyond that, under the operation of order 1498, the entire burden of placing West Monroe on a parity with Monroe, with respect to all business to the eastward of the Ouachita river, is thrown upon plaintiff.

Thus it is conceded that the order operates no change whatever in the rates established by the other roads. In fact, its application is limited, by its own terms, to plaintiff, and its effect is stated by plaintiff's superintendent in the following testimony, which is wholly uncontradicted, to wit:

"Q. Mr. Hearn, do you know what the situation is as to rates from Monroe and West Monroe to competitive points, and also to stations, on the V., S. & P. Railway? I don't care to know what they are, but I want to know if there is any difference between them. A. The rates from Monroe and West Monroe are the same to competitive points. Q. Now, as to stations on the V., S. & P. Railway? A. The rates from Monroe and West Monroe to V., S. & P. Railway stations are the same. Q. Now, on a shipment, under the conditions as they existed prior to the adoption of the order in contest here, would a shipper be required to pay more for the transportation of freight from West Monroe to New Orleans than from Monroe to New Orleans? A. No, sir; they were the same. Q. Now, under the workings of the order in contest here, what would be the result, as to the plaintiff company, providing a shipment moved out from West Monroe, via the plaintiff company, as a switching proposition of $3 per car, and then forwarded from Monroe to New Orleans? A. The result is that the V., S. & P. Railway would suffer a loss in its revenue. * * * Q. You may say whether or not that division of the through rate, under the previous arrangement, was more or less than $3 per car. A. The division of the through rate amounted to more than $3 per car. Q. You may say whether or not it varied with the different classes or commodities of freight. A. It did, yes, sir, vary according to the class or commodity of the freight moving. Q. Mr. Hearn,

what, if any, advantage will a shipper, to a competitive point such as New Orleans, or a point on the V., S. & P. Railway, enjoy, under the order now in contest here, as compared with the rates he received under the tariffs in effect prior to the adoption of this order? A. None whatever. He will enjoy no advantage whatever. Q. Then who, if any one, sustains a loss by reason of the operation of this order? A. The V., S. & P. Railway Company is the sufferer. Q. To whose advantage does the switching order here in contest operate? A. To the advantage of our connecting carriers. Q. Then, as I understand it, the connecting carriers, at Monroe, pay, under the order in contest here, a flat switching charge of $3 per car, irrespective of destination or the class or commodity of freight handled; they pay that flat rate, instead of a division of the through rate, as under the old tariffs, and the shipper, * * * to points on the plaintiff company's line, and all competitive points, which include the market centers of Louisiana, is not benefited? A. No, sir; they derive no benefit whatever from this new order of the Commission requiring us to switch cars at $3 per car."

As illustrating the difference, to plaintiff, between the operation of the old and the new order, it may be stated that, under the old order, plaintiff's share of the through freight, on a car load (say 40,000 pounds) of grain, from New Orleans to West Monroe, would have been $8 whereas, under the new order, it gets a flat switching fee of $3, and the difference of $5 goes into the treasury of the connecting carrier, who participates in the service, and who has made no complaint of the old rate. We may add, too, that if the service rendered by plaintiff, in transporting freight over its road and bridge, between Monroe and West Monroe, and the use of its terminal facilities at West Monroe, are to be regarded, together, as a mere local "switch movement," for which the flat rate of $3 is to be charged, it is more than likely that such rate will be applied to interstate, as well as intrastate, shipments. Thus Mr. Hearn, being asked as to the eventual effect, upon plaintiff's interests, of the order here in question, replied:

"It will not only reduce our revenues on intrastate business, but it will reduce the revenues on interstate business, because, even without an order from the Interstate Commerce Commission, the shippers and connecting carriers will avail themselves of the opportunity of switching a car over from West Monroe to Monroe destined to an intrastate point, and there is no power that can prevent them from reconsigning that car to an interstate point, and it will have the effect of destroying the revenues from that station. It would be impossible for the V., S. & P. Railway to watch the movement of all this traffic so closely as to prevent such reconsignments, to the detriment of the company, and it would naturally suffer from it."

The only instance in which the shipper derives any advantage from the new rule, and that altogether at the expense of the plaintiff, is shown in the following testimony of the same witness, to wit:

"Q. Mr. Hearn, you have testified that, as to competitive points and market centers in the state of Louisiana, and stations on the line of the plaintiff company, a shipper in West Monroe, or Monroe, would gain no advantage, in the matter of rates, under the existing rate conditions; that is, as to competitive points? A. Yes, sir. Q. Now I will ask you in what instances would a shipper from West Monroe be benefited by the terms of the order here in contest? A. Well, a shipper, having a car load of ice moving from West Monroe to some local point in Louisiana, on the Iron Mountain Railway, or the A., L. & G. Railway, would be benefited by the $3 rate, because such traffic moves on a combination of locals, less 10 per cent., as at present, whereas, under the order of the Commission, the V., S. & P. Railway would derive a $3 revenue, and then the Iron Mountain or the A., L. & G. Railway would assess its local rate from Monroe to the destination of the car. That would apply to ice and all other commodities moving, locally, from West Monroe to points on the Iron Mountain and the A., L. & G. Railway."

And, as we should imagine, would also apply to commodities moving, locally, from the points mentioned to West Monroe. What that local business, from and to West Monroe, amounts to, is not shown. But it is shown, and so appears from the Constitution and the law, that the defendant Commission has the power to require of the connecting roads that their combined local rates shall be reasonable; and it fails to show a situation which demands a reduction in the rate established by the one road and not by the others. The learned counsel for defendant insist that the handling, by plaintiff, of the

freight passing between Monroe and West Monroe may properly be placed in the category of a switching service, and, when so placed, may be required to be performed at the same rate for each car, irrespective of its weight or the character of its contents, and they cite a number of instances in which switching is shown to be done between different points, bearing various relations to, and lying at different distances from, each other; but there appears to be no instance where the conditions are shown to be even substantially the same as those here disclosed. Monroe and West Monroe are distinct corporations, geographically, with a river flowing between them, politically, with a separate government for each, for all business and social purposes, with their respective post offices, banks, railroad and telegraph stations, manufacturing, wholesale, and retail business houses, paved streets, churches, etc., with several railroads extending into Monroe, and but one into West Monroe, and dividing the cost of the bridge, erected by plaintiff, which connects the two places, by the cost per mile, of plaintiff's road, the bridge alone represents, for the purposes of any division of through freight about 25 miles of road, to which may be added the cost of plaintiff's quite extensive terminal facilities at West Monroe. Several of the witnesses have given their definitions of "switching," and we find the following in the books:

"Switching Service. A term which relates only to the removal of cars over spur tracks after they have reached the terminal point of the same road line and, after being unloaded, are transferred on a spur track, usually, to the place of business of the consignee; transfer service." 37 Cyc. 659, referring to Dixon v. Central Georgia R. Co., 110 Ga. 173 et seq, 35 S. E. 369.

The definition given in the case cited is somewhat more comprehensive, for the learned Georgia court says:

"The test of distinction between 'transportation' service, relatively to loaded freight cars, for which a railway company can lawfully charge tonnage rates, and 'switching' or 'transfer' service, for which it is restricted to a fixed charge per car, is not whether the movement of the cars involves the use of a portion of the company's main line or that of another, for there may be a transportation service over one or more spur tracks of the same company, if the contract of affreightment requires no movement over other tracks or lines of railway, whereas a switching or transfer service is one which precedes or follows a transportation service, and applies only to a shipment on which legal freight charges have already been earned or are to be earned." Dixon v. Central of Ga., 110 Ga. 173, 35 S. E. 369.

It is quite clear that the service rendered by plaintiff does not fall within the foregoing definitions, and we think it equally clear that it should not, by a mere declaration of the Commission to that effect, be dealt with as a service, the compensation for which may be restricted to a fixed sum per car, irrespective of the character of its contents or its weight, and irrespective of the conditions under which the service is rendered.

Where freight is received for transportation, and delivered by the same carrier, or by a connecting carrier, as a party to a through contract, the charge, for the transportation and delivery, is largely regulated by the character of the commodity; and as some classes of goods are more valuable and involve greater responsibility, and some are more difficult to handle and involve greater expense than others, the charge for carriage, handling, and delivery is determined, accordingly, and includes the entire service. But there is no rational theory upon which one of the carriers, in any such case, can be entitled to the highest rate and another be required to accept the lowest.

[4, 5] Again, switching service, as between railroad companies, is usually reciprocal, and it is inconceivable that, when a particular company has hauled a car load of high class freight to the end of its road, it should have the right to require another company to continue the haul and deliver the car at its ultimate destination, at a fixed price, without

reference to the character of the contents of the car; and especially is that true where there is no possibility of its rendering a reciprocal service to such connecting company. And further it is unreasonable to suppose that a railroad company can afford to acquire extensive terminal facilities, build, maintain, and operate a drawbridge, at an original cost of $276,662.70 and an annual expense exceeding $2,000, and charge no more for the use of those facilities, in the loading, unloading, and handling of freight cars, than for ordinary switching operations upon a track costing $11,000 per mile. There is considerable testimony in the record in regard to the actual cost of the handling of cars, which defendant has declared to be "switch movements," and the expert called by defendant has given the opinion that it amounts to $1.34 each way, or $2.68 for the round trip between Monroe and West Monroe. Other witnesses testify that four days are consumed in taking a car from Monroe to West Monroe, obtaining the load, returning, and unloading, and that the value of the use of the car is fixed by the universal charge of 45 cents per day which all railroad companies make and submit to on account of cars held by other companies out of the service of their owners. Defendant's witness, though admitting that all companies get the per diem allowance for their cars, was unwilling to admit that such allowance, or the value represented by it, should be considered in determining the cost of the service here in question. Defendant's counsel simply deny that plaintiff pays anything for the use of the cars of other companies or that it charges anything for the use of its own. Thus we quote from their brief:

"No money is ever paid by the Vicksburg, Shreveport & Pacific Railway for cars, in a switch movement, which are returned in four days. It is simply a matter of bookkeeping, and the reports show that, instead of the per diem being an expense to the Vicksburg, Shreveport & Pacific, it is a source of revenue. Besides, on its own cars, no per diem charges are ever made," etc.

The number of days during which plaintiff's cars are held by other companies exceeds the number during which plaintiff holds the cars of such companies, and the balance of account is in plaintiff's favor, but that does not prove that plaintiff is not a debtor for the cars held by it; nor does it prove that its own cars, for which, in the service of other companies, it is credited with 45 cents per day, may be devoted by it to switching or other service, without cost to itself. The witnesses were unable to fix the cost of the switching with exactness, but the weight of the testimony is to the effect that it exceeds the amount allowed by order 1498; and for that reason, in connection with the other reasons given, we are of opinion that the order is unreasonable, and that the judgment annulling it and prohibiting its enforcement should be affirmed.

The judgment appealed from is accordingly Affirmed.