MILLER & Co. *v.* THE GEORGIA RAILROAD & BANKING Co.

88    563
f110  184

1. It is competent for a common carrier whose customers at their option have the privilege of unloading for themselves the vehicles in which their freights are shipped, to adopt and enforce a reasonable regulation as to the time within which the vehicles may be unloaded free of any expense for storage, and to fix a reasonable rate per day at which storage will thereafter be charged for the use of such vehicles so long as they remain unloaded.
2. A rate of one dollar per day for each railroad car thus devoted to the use of storing freight, is not necessarily unreasonable because cars are of different sizes and vary in capacity, nor because a fraction of a day is charged for as a whole day, nor because the customary rate of storage in warehouses or elevators is much lower; nor is it, as matter of law, unreasonable for any cause.
3. A particular common carrier, though a corporation, makes a regulation its own by adopting it and acting upon it, irrespective of the source from whence it is derived; and therefore, that it was promulgated by a person or board of persons representing a combination of such carriers would make no difference.
4. As between the carrier and customers who have notice of the regulation before shipments are made, the regulation is operative whether indicated upon bills of lading or not, and whether the shipments are made to the order of the consignor with the customary direction to notify the customer, or directly to the customer himself.
5. In construing the phraseology of a regulation expressed in this language: "it being understood that said car or cars are to be placed and remain accessible to the consignee for the purpose of unloading during the period in which held free of demurrage, and that when the period of such demurrage charge commences they are to remain accessible to the consignee for unloading purposes," the course and exigencies of business are necessarily to be regarded; and hence the cars after their arrival at destination, though not kept accessible at every moment of time, are to be treated as being and remaining accessible if the carrier is always ready to render them so within the shortest practicable time, not longer than a few hours, after being notified that the customer is ready to unload.
   December 7, 1891.

Railroads. Carriers. Storage and demurrage. Charge of court. Before Judge EVE. City court of Richmond county. August term, 1890.

The opinion states the material facts. The instructions which the defendants requested to be given to the jury, and which the court refuse to give, are as follows:

(*a*) Plaintiff cannot by rule fix upon any rate of storage or demurrage unless it is reasonable, and in arriving at what would be a reasonable charge the jury are permitted to examine what are the customary charges for the storage of grain.

(*b*) In the absence of an express contract, or a stipulation for demurrage charges in the bill of lading, the the consignee is not liable for demurrage.

(*c*) Before the plaintiff could recover demurrage for the use of the cars, it would have to prove that the detention prevented its making profits by the use of the cars. The plaintiff must show a loss of service of the cars and the amount of damage by detention, in order to recover for demurrage.

(*d*) Under the charter of the plaintiff it is not authorized to make charges for storage, except by rules established by the board of directors; and if you find that the rule under which the plaintiff makes the charge for storage or demurrage in this case was adopted and promulgated by any association or person other than the board of directors of the plaintiff, the same is illegal and does not entitle plaintiff to make any charge for storage or demurrage. (Plaintiff read the twelfth section of its charter (act of 1833), authorizing it to charge for storage and to fix reasonable rates; defendants relied on section first of the act of 1835, claiming that such rules could only be promulgated by the directors, and that the evidence disclosed that the rule was established and published by the Southern Railway & Steamship Association (of which the plaintiff was a member), and

was therefore invalid and illegal as contravening both the charter and the general law.)

(*e*) If the jury believe that the known, certain, general and universal custom and practice of plaintiff and common carriers in the State and county prior to November, 1889, was not to charge either for storage in cars on the tracks or for demurrage in car or cars, then that custom becomes binding on carriers, shippers and consignees, and could not be changed by a mere notice on the part of the carrier to the consignee that demurrage would be charged.

(*f*) As a matter of law the plaintiff is not entitled to charge for demurrage on cars remaining loaded on its tracks. If the plaintiff desired the use of the cars, or to return those containing the grain, it was at liberty to unload the grain into its warehouse, or the warehouse of a third person, or into the elevator, and if it failed to do so it cannot make defendants liable for the detention of cars. Plaintiff, by the exercise of its legal rights, could have unloaded the cars, charged and collected storage and avoided the detention of the cars, and if it failed so to do it cannot thereby render defendants liable for demurrage charge.

(*g*) Demurrage in law is limited to the charges for the detention of ships. Railroad companies are not allowed to charge therefor.

(*h*) The freight charges of a railroad include all usual expenses and charges for the goods from the time they are shipped until the relation of common carrier ceases by the delivery, or actual storage, of the goods. As long as the goods are left in the cars they are not stored, but the plaintiff holds them as common carrier.

(*i*) Grain and ponderous articles may be delivered without being unloaded actually, but the relation of common carrier of grain in bulk continues until the goods are actually unloaded and stored, or until the car

is placed at the usual place of delivery, or at a point accessible to the consignee where they can conveniently unload.

(*j*) If the jury find from the evidence that, forty-eight hours after the notice was served, any or all of the cars mentioned were in the depot-yard of plaintiff at a point at which they were inaccessible to defendants, and thereafter they paid the freight, and subsequently to the payment of the freight the cars had to be hauled or carried by plaintiff from the yard to the usual point where the cars were delivered to the defendants, then I charge you the relation of common carrier continued up to the time when the cars were carried to the point of delivery; and the plaintiff is not entitled to recover either storage or demurrage for the time prior to the placing of cars at such a point. Nor would it be entitled to charge for the detention or use of the cars, until a reasonable time for unloading had elapsed after the car had been placed at such a point.

(*k*) So long as the cars containing the grain have to be moved by the railroad company, or hauled or carried from one place to another, so as to be delivered to defendants, the relation of common carrier exists, and the railroad company has not become a warehouseman as to the goods therein and cannot charge for storage or for demurrage on the cars.

The parts of the charge of the court assigned as error are:

"A regulation of the railroad company that such freights in bulk or otherwise, as to which it is the custom for cars to be unloaded by the owners of the property, shall be charged one dollar per car for each day such car is not unloaded, at the expiration of forty-eight hours, which forty-eight hours shall commence at ten o'clock A. M. of the day after notice of the arrival of the car is given to the owner of the property, is a reasonable

regulation and binding upon the customers of the railroad company who have notice of the same.

"If the jury shall find that it was a regulation of the railroad company at the time to charge for storage or demurrage at the rate of one dollar per day for each car when freight like the defendants' was not unloaded in forty-eight hours after the commencement of the notice to the defendants, and if the jury shall find that the plaintiff gave the defendants notice of such regulation, and of the arrival of the cars containing defendants' freight, then the defendants are bound thereby, and the plaintiff is entitled to recover in this action at the rate of one dollar per day for each car which plaintiff shows to you was covered by the regulation.

"I charge you that the rule and regulation was a valid one, that it was reasonable, and that if the railroad complied with its part of it by delivery at a point accessible to the consignee, or if it substantially complied, or what might be termed constructively complied, by notifying the consignee that the goods had arrived, and that it actually had them in position for prompt delivery, and that the defendants delayed complying with that rule, then they would be liable for the charges."

JOSEPH R. LAMAR, for plaintiffs in error.

JOSEPH B. CUMMING, contra.

SIMMONS, Justice.

The Georgia Railroad Company sued Miller & Co. for the sum of $892, besides interest, the declaration containing two counts, as follows:

(1) "On the first of January, 1890, and on various days thereafter up to the time of filing this complaint, petitioner stored on its tracks in said county certain carloads of corn, wheat, grain and other produce, at the special instance and request of said Miller & Company, by means whereof said Miller & Company became indebted to your petitioner for said storage at the rate of

one dollar per day for each and every of said car-loads, amounting to the aforesaid sum of $892." (2) "Your petitioner further shows that said Miller & Company is further indebted to your petitioner in the sum of $892, besides interest; for that heretofore, to wit before the first day of January, 1890, your petitioner, who is a common carrier of goods and merchandise, made and put in operation a reasonable rule or regulation for the conduct of its business, of which rule or regulation said Miller & Company had notice, by virtue of which said Miller & Company became liable to pay your petitioner the sum of one dollar for every day, commencing forty-eight hours after notice of arrival, on each and every car-load of property stored by your petitioner on its tracks or elsewhere. Your petitioner shows that after said first day of January, 1890, and up to the time of filing this complaint, your petitioner has so stored a large number of car-loads of property, a schedule of which is hereunto annexed; by means whereof said Miller & Company have become indebted to your petitioner in the sum of $892, besides interest. Your petitioner shows that said Miller & Company fail and refuse to pay said sum," etc.

The rule or regulation here referred to is as follows:

"DEMURRAGE RULES.

"Concerning loaded cars to be unloaded by consignees.

"Bulk-meats, bulk-grain, hay, cotton-seed, lumber, lime, coal, coke, sand, brick, stone, wood and such other freights in bulk or otherwise, as it may be a stipulation of the rates thereupon, or contract for the transportation thereof, or where it is the custom for the cars to be loaded and unloaded by the owners of the property, which is not unloaded from the cars containing it in forty-eight hours, not including Sundays or legal holidays, computed from ten o'clock A. M. of the day following the day of arrival, shall be subjected thereafter to a charge for demurrage of one dollar for each day or fraction of a day that said car or cars remain loaded in the possession of the company, by whom to be delivered as the last carrier at interest; it being understood that said car or cars are to be placed and remain accessible to the consignee for the purpose of unloading during

the period in which held free of demurrage, and that when the period of such demurrage charge commences they are to remain accessible to the consignee for unloading purposes."

The jury found in favor of the plaintiff, and the defendants made a motion for a new trial, which was overruled, and they excepted. Without undertaking to discuss separately and in their order the numerous grounds of the motion, it is sufficient to say that, in addition to the general objections that the verdict is contrary to law and the evidence, they complain in substance as follows : (1) that as matter of law, a railroad company is not entitled to charge "demurrage" or storage on cars remaining unloaded on its tracks; and hence the rule in question is invalid and the defendants are not subject to the charges recovered; (2) that the charge fixed by this rule is unreasonable ; (3) that the rule was not promulgated by the proper authority, but emanated from a combination of persons other than the board of directors of the Georgia Railroad ; (4) that the regulation is inoperative because not indicated upon the bills of lading ; (5) that the cars were not accessible during the whole period for which demurrage was charged.

1. It is the undoubted right of a common carrier to adopt and enforce, as between itself and its customers, any reasonable regulation for the conduct of its business, the purpose and effect of which is the protection of the carrier and the benefit of the public. The rule in question, we think, falls clearly within the scope of this power. It seeks to prevent the diversion and detention of cars from the legitimate work of transportation, as well as to secure compensation for service not otherwise paid for, by prescribing, in cases where by contract or custom the carrier is under no duty to unload the cars but they are to be unloaded by the customer, a rate *per diem* in the nature of a charge for storage, to begin at a

certain time after the cars have been delivered to the customer or placed at his disposal for unloading. Such a regulation cannot be regarded as unreasonable so long as a reasonable time is allowed for unloading and so long as the charge for the use of the cars beyond that time is not excessive. The law compels the carrier to receive the goods of the public and to transport and deliver them within a reasonable time. Code, §2029; 2 Am. & Eng. Enc. of L., tit. Carriers, p. 787. To do this it is necessary that the means of transportation shall be under the carrier's control, and that after the duty of carriage has been performed, its vehicles shall not be converted into storehouses, at the will of consignees, to remain such indefinitely and without compensation. If no check could be placed upon such detention, it is plain that the business of transportation would be at the mercy of private interest or caprice, and that carriers, thus hampered in their facilities and unable to foresee the time or extent to which their vehicles would be diverted from the work of carriage, could not provide properly for the demands of traffic or perform with dispatch their legitimate function. It would place upon the carrier the burden and expense of supplying numerous vehicles not needed for the hauling of freights, thus requiring it to provide extra facilities, as well as to render extra service, without compensation beyond that received for transportation. It would result in the accumulation of cars on the carrier's tracks and the obstruction in a greater or less degree of the movement and unloading of trains. Not only would loss ensue to the carrier, but consignees and shippers in general and the people at large must suffer seriously from this hindrance to the due and regular course of transportation. In this matter the public have rights paramount to those of any individual or class of individuals, and the business of the common carrier must be

so conducted as to subserve the general interest and convenience. Especially is this true as to railroad companies, in view of the important franchises granted them by the public, and the use and control thus acquired of highways upon which the commerce of the country is so largely dependent.

The need of regulations of the kind in question is well illustrated by the evidence in this case. The general manager of the plaintiff testified that before this rule was adopted, consignees were often dilatory in removing freight from the cars in which it was shipped, and "the cars were detained day after day, and days lengthened into weeks, until our transportation work was subjected to immeasurable embarrassment; the transportation of the company was well-nigh paralyzed,—not for lack of cars, for we had plenty, but because our cars were converted into warehouses. The trouble grew and finally culminated in a threatened blockage throughout the country. It has been a part of our experience to be threatened with suit by the shipper for not moving the freight promptly. We are supposed to always have cars ready to transport any freight that is offered; we endeavor to make proper arrangements to do so; but the trouble was, that when A had freight to ship B had our cars and we could not get them."

It was contended by counsel for the plaintiff in error that the railroad company could unload the cars into a warehouse or elevator, and thus avoid detention. On the other hand, counsel for the railroad company contended that in the cases provided for by this rule,—that is, where it is a stipulation of the rates or contract for transportation, or is the custom, for the cars to be loaded and unloaded by the owners of the property, it would be a breach of contract if the company were to unload, which would subject it to at least nominal damages. We do not think it material, as affecting the right to

make a charge of this character, that the goods remain in cars instead of being put into a warehouse. It is well settled that the carrier, in addition to its compensation for the carriage of goods, has the right to charge for their storage and keeping, as a warehouseman, for whatever time they remain in its custody after reasonable opportunity has been afforded the owner to remove them. Hutchinson, Carriers, §378; *Southwestern R. Co.* v. *Felder*, 46 *Ga.* 433. And we think where the carrier's duty ends with the transportation of the car and its delivery to the customer, and no further service is embraced in the contract, the carrier, after a reasonable time has been allowed for unloading, is as much entitled to charge for the further use of its car as it would be for the use of its warehouse. We know of no good reason why it should be restricted to the latter method of storage. There is no law which inhibits the use of cars for this purpose, or which requires unloading and removal of the goods to some other structure before any charge for storage can attach. This method of storage may in many cases be as effectual as any other. Indeed, it may serve the customer's interest and convenience much better to have the car placed at his own place of business where he may unload it himself, or where it may be unloaded by purchasers as the goods are sold, thus saving drayage and other expenses, than to have it unloaded by the carrier and the goods stored elsewhere at the customer's expense. And if a customer whose duty it is to unload, and who, failing to do so within a reasonable time, accepts the benefit of storage in a car, by requesting or permitting the carrier to continue holding it unloaded, in his service and subject to his will and convenience as to the time of unloading, he cannot be heard to complain of the method of storage and to deny the right to any compensation at all for this service, on the ground that some other method was not resorted to.

He may insist that the rate fixed shall not be unreasonable or excessive, but the law cannot be invoked to declare that no compensation whatever shall be charged for such extra service.

It was contended by counsel for the plaintiff in error that "demurrage," which is the designation given to this charge by the rule in question, is allowed only in maritime law, and cannot be demanded by a railroad company in the absence of a stipulation therefor in the bill of lading. And in support of this view the cases of Chicago & N. W. Ry. Co. v. Jenkins, 103 Ill. 588, and Burlington & M. R. Co. v. Chicago Lumber Co., 15 Neb. 391, are cited. In the former of these cases it is said: "The right to demurrage, if it exists as a legal right, is confined to the maritime law, and only exists as to carriers by sea-going vessels. But it is believed to exist alone by force of contract. All such contracts of affreightment contain an agreement for demurrage in case of delay beyond the period allowed by the agreement, or the custom of the port allowed the consignee to receive and remove the goods. But the mode of doing business by the two kinds of carriers is essentially different. Railroad companies have warehouses in which to store freights; owners of vessels have none. Railroads discharge cargoes carried by them; carriers by ship do not, but it is done by the consignee. The masters of vessels provide in the contract for demurrage, while railroads do not; and it is seen that these essential differences are, under the rules of the maritime law, wholly inapplicable to railroad carriers." The decision in the Nebraska case does not go into any discussion of the question, but merely cites and follows the holding of the Illinois court. In our opinion the reasoning above quoted is inconclusive. We see no satisfactory reason why carriers by railroads should not be entitled to compensation for the unreasonable delay or detention of their vehicles,

as well as carriers by sea. What we have already said, we think, is a sufficient answer to the reason assigned, that railroads have warehouses in which to store freights. And the reason that "railroads discharge cargoes carried by them" and "carriers by ship do not but it is done by the consignee," of course cannot operate as to the cases provided for by this rule, which by its terms applies only where the unloading is to be done by the owners of the property. Nor is it settled that the right to de-murrage in maritime law exists only by express contract. In this country the courts have repeatedly declined to follow the rulings of the English common law courts on this subject, and have held that the ship-owner has a lien upon the cargo for demurrage notwithstanding the absence of any stipulation therefor in the bill of lading. 5 Am. & Eng. Enc. of Law, tit. Demurrage, p. 546; Porter, Bills of Lading, §356. See also Huntley v. Dows, 55 Barb. 310, and Hawgood v. 1310 Tons of Coal, 21 Fed. Rep. 681, and cases there cited.

But we are not controlled by the principles which govern as to demurrage under the maritime law. The adoption by the railroad company of the term "demurrage" as a designation for this charge, does not require us to resort to that law as a standard for testing the validity of the rule. We are to look to the real substance and effect of the rule, rather than to analogies suggested by the technical designation which the carrier in this instance has seen fit to adopt. To hold that because the conditions of carriage by sea are different, no charge under this name can be enforced by a carrier by land, or that if allowed, it must be governed by the rules of the marine law, would be to adopt a narrow and merely technical view, ignoring well recognized grounds of public policy and the right of the carrier to prescribe reasonable rules and regulations for its own safety and the benefit of the public. The instances are

few in which regulations similar to the one in question have been passed upon by the courts. The only cases we have found in which the right of a railroad company to make a charge of this kind is denied, are the ones above referred to. On the other hand, the right is sustained by the Supreme Court of Massachusetts. Miller *v.* Mansfield, 112 Mass. 260. See also a full and able discussion of the question by Toney, J., of the Law and Equity Court of Louisville, Kentucky, in a decision which has appeared since the judgment in the present case was announced. Kentucky Wagon Mfg. Co. *v.* Louisville & Nashville R. Co., 11 Rwy. & Corp. Law Jour. 49.

2. We cannot as matter of law say that the rate of $1 per day for each car is unreasonable. It is not necessarily unreasonable because the cars vary in capacity, nor because a part of a day is charged for as a whole day. Nor can we hold that the customary rates for storage in warehouses and elevators must be the measure of compensation where the storage is in cars on the tracks of a railroad. Indeed, if it be a legitimate object of this rule to prevent the diversion of cars from the work of carriage, it would seem but proper that the charge for their use when detained as a means of storage, should not be such as to encourage customers to adopt that means instead of the more regular and usual methods. Moreover there was no evidence to show that the rate fixed by this rule was higher than those customary for storage of other kinds. On the contrary, there was evidence tending to show that storage in a car, at the rate fixed by the rule, might be much less expensive than storage elsewhere, the general manager of the railroad company testifying that the modern car carries from 50,000 to 60,000 pounds, and that storage in the company's depot of a car-load of 50,000 pounds would amount to $1.25 per day. He testified further: "The

rate of $1 per day does not compensate us for the detention of the cars, and it was simply to induce the shipper to unload that the rule was passed."

3. That the rule was promulgated by a person or board of persons representing a combination of carriers, did not impair its effect as a regulation of this particular company. A common carrier, though a corporation, makes a regulation its own by adopting it and acting upon it, irrespective of the source from whence it is derived.

4. Where a regulation of this character is known to the customer before the contract for transportation is made, it is to be presumed, in the absence of any evidence to the contrary, that the parties contracted with reference to it (Miller *v.* Mansfield, *supra*), and it is operative whether indicated upon bills of lading or not, and whether the shipments are made to the order of the consignor with the customary direction to notify the customer, or directly to the customer himself.

5. The plaintiff's mode of delivery of the cars to the defendants was to place them on a certain track "designated as belonging to the Augusta & Summerville Railroad" and known as "track 38"; from which point they went "into the possession of the Central Railroad," upon whose side-track, in another part of the city, the defendants' place of business was situated. Cars were not delivered on track 38 until the freight was paid and the bill of lading surrendered. Until then they were inaccessible for unloading, being kept elsewhere in the plaintiff's yard. After payment of the freight, the defendant could at any time have his cars moved where they would be accessible, but sometimes it would take from one to five hours after the freight was paid before they could be placed at the point of delivery. It was contended that the time thus required for placing the cars in position should not be included in computing the time which should run

against the defendants under the rule in question, the rule containing this language, to wit : "it being understood that said car or cars are to be placed and remain accessible to the consignee for the purpose of unloading during the period in which held free of demurrage, and that when the period of such demurrage charge commences they are to remain accessible to the consignee for unloading purposes." Certain instructions of the court on this subject and the refusal to charge thereon as requested by the defendants, were the basis of several assignments of error, which will be found set out in the reporter's statement. Taking the whole charge in connection with the evidence, we think the law applicable to this part of the case was fairly presented. The court, having instructed the jury, in substance, that if the defendants had notice of this rule or regulation, and the goods were shipped under a contract that they were to be unloaded by the consignees, and the plaintiff notified the consignees of the arrival of the car and of its readiness to deliver the goods, and the consignees did not receive and unload them within the time stipulated by the rule, the defendants would be liable for the charge fixed by the rule for the detention of cars, added the following : "The railroad will have complied with that rule and regulation if you find from the testimony that it placed these cars at a point where they were accessible to the consignees, and allowed them to remain there during the time fixed by the railroad when they would be free from demurrage, or where it gave notice that it was ready to place them in such position. The mere giving notice, if there was evidence that it was not ready to place them in that position, would not avail ; but if you find that the cars were in a position where they could be placed in an accessible place, and the road offered to place them, by sending notice that it was ready, then that would be a substantial compliance with the rule

v 58-37

and regulation. But if the consignees elected to delay and not receive them, they would be liable for the charges under the rule." Also : "If you are satisfied from the testimony that the cars, up to the time of actual delivery or taking possession, were inaccessible, that the railroad could not comply with its offer and that the delay was not the fault of the defendants, then no demurrage under this rule could be enforced, and your verdict would be for the defendants." We think the instructions complained of, as to substantial compliance with the rule, read in connection with the instructions above quoted, give a reasonable and proper interpretation of that part of the rule which relates to delivery at a point accessible to the consignee. In construing its phraseology, the course and exigencies of business are necessarily to be regarded ; and hence the cars after their arrival at destination, though not kept accessible at every moment of time, are to be treated as being and remaining accessible if the carrier is always ready to render them so within the shortest practicable time, not longer than a few hours, after being notified that the customer is ready to unload. There is no evidence in the record that the cars were not at all times accessible, in this sense, or that there was any undue or unnecessary delay in placing them in position for unloading, after notice from the defendants that they were ready to receive them.

6. The evidence is sufficient to uphold the verdict.

*Judgment affirmed.*