**IVERSEN et al. v. UNITED STATES et al.**
Civil Action No. 32098.

District Court of the United States for the District of Columbia.

Jan. 8, 1946.

Judgment Affirmed March 25, 1946.

See 66 S.Ct. 825.

1002

Haskell Donoho and Ashley Sellers, both of Washington, D. C., and Dale C. Dillon, of Mount Ranier, Md., for plaintiff Gustafus V. Iversen.

Wendell Berge, Asst. Atty. Gen., Edward Dumbauld, Sp. Asst. to the Atty. Gen., and Edward M. Curran, U. S. Atty., of Washington, D. C., for the United States.

J. Stanley Payne and Daniel W. Knowlton, both of Washington, D. C., for defendant Interstate Commerce Commission.

Karl D. Loos and Preston B. Kavanagh, both of Washington, D. C., for intervenor California Fruit Growers Exchange.

K. P. Casey, of Washington, D. C., for intervenor International Apple Association.

Richard H. Field, of Washington, D. C., David F. Cavers, of Cambridge, Mass., and M. D. Miller, of Washington, D. C., for intervenor Chester Bowles, Office of Price Administration.

Before PRETTYMAN, Associate Justice, United States Court of Appeals, District of Columbia, and BAILEY and HOLTZOFF, Associate Justices, District Court of the United States for the District of Columbia, sitting as a statutory three-judge court.

PRETTYMAN, Justice.

Plaintiffs bring this action praying that the court set aside and enjoin the execution of certain orders of the Interstate Commerce Commission, being Third Revised Service Order No. 180, Fourth Revised Service Order No. 180, Service Order No. 394, and Service Order No. 396. These orders directed changes in demurrage rules and charges on refrigerator cars. They recited that these cars are being delayed unduly while held for orders, loading and unloading, etc., thus impeding and diminishing the use, control, supply, movement, etc., of such cars, and that in the opinion of the Commission an emergency exists requiring immediate action to prevent a shortage of railroad equipment and congestion of traffic. Prior to the issuance of Revised Service Order No. 180 on October 2, 1944, the uniform demurrage practice was no charge for the first two days (excluding Sundays and legal holidays) during which a car was held for loading or unloading, which two days are known as "free time"; a charge of $2.20 per car per day for the first two days after expiration of the free time, and a charge of $5.50 per car per day for each day or fraction thereof thereafter. Revised Service Order No. 180 directed the railroads to supplement their tariffs so as to charge $11 per car per day for the fourth day after the expiration of free time, $22 per car per day for the fifth day, and $44 per car per day for the sixth and all successive days. Third Revised Service Order No. 180, issued May 24, 1945, did not alter that schedule. By Fourth Revised Service Order No. 180, entered December 7, 1945, the Commission ordered the railroads to supplement their tariffs by providing that Sundays and holidays be included in the computation of free time for demurrage purposes; that a charge of $11 per car per day be made for the first day after the expiration of free time, $22 per car per day for the second day, and $44 per car per day for the third and all successive days. By Service Order No. 394, entered December 7, 1945, the Commission ordered the railroads to supplement their tariffs with a general provision that all Sundays and legal holidays be included in computing free time on refrigerator cars. By Service Order No. 396, the Commission directed the railroads to supplement their tariffs by providing that carload shipments of perishables held more than two days, exclusive of Sundays and bank holidays, at any point prior to delivery at the ultimate destination and reforwarded upon request of the consignor, consignee or

owner, should be subject to the full local or joint rate to the reforwarding point, plus the tariff rate from the reforwarding point in effect from the point of origin. These orders were made applicable to intrastate as well as to interstate commerce. Third Revised Service Order No. 180 expired by its own terms December 1, 1945, and the prayer for its injunction is, therefore, moot. Fourth Revised Service Order No. 180, Service Order No. 394 and Service Order No. 396 expire by their own terms on February 15, 1946.

Defendants filed motions to dismiss. Both plaintiffs and defendants filed motions for summary judgment.

These service orders of the Commission were issued without hearing. Plaintiffs contend that the Commission was without power to issue such orders without hearing.

The existence of the emergency is not denied and the reasonableness of the charges established by the orders is not challenged in this proceeding. The question presented concerns the statutory power of the Commission.

The emergency powers of the Commission which permit it to issue certain orders without hearing, are conferred by Section 1(15) of the Interstate Commerce Act, 49 U.S.C.A. § 1(15). This section of the statute authorizes the Commission, whenever it is of opinion that shortage of equipment, congestion of traffic or other emergency exists, to suspend, with or without notice or hearing, the operation of "rules, regulations, or practices then established with respect to car service" and to make such just and reasonable "directions with respect to car service" during the emergency as in its opinion will best promote the service in the interests of the public and the commerce of the people. Car service is defined by Section 1(10) of the Act to include the use, control, supply, movement and distribution of cars.

The question in the case at bar is whether the computation of "free time" and the scale of demurrage charges are rules[1] with respect to the use, supply or movement of cars. If so, the orders of the Commission, involved in this action, were within its emergency powers; if not, they are invalid because issued without hearing

Demurrage was originally a maritime term. The right of a railroad to make a demurrage charge was originally challenged as beyond its power except by contract. The right was sustained by the courts upon the ground that a common carrier has the right to adopt and enforce any reasonable regulation for the conduct of its business, where the purpose and effect are the protection of the carrier and the benefit of the public.[2] As early as 1891, the Railroad Commissioners of Kansas issued a circular to the general managers of the railroads in Kansas, saying:

"In view of the present flattering prospect for abundant crops of farm produce in Kansas, and as a means to avoid the possibility of a shortage in transportation facilities, the commission desires to respectfully impress upon you the importance of a thorough and uniform system for the apportionment and distribution of cars among the several stations and shippers along the line of your road. As a means to this end we beg leave to submit the following suggestions, and ask if they meet with your approval, that instructions be issued to your agents accordingly, viz.:

\* \* \* \* \* \*

"Seventh: A demurrage charge should be rigidly collected when cars are held an unreasonable time for loading."[3]

In 1894 the Virginia Supreme Court of Appeals considered the validity of a de-

---

[1] The Supreme Court thus epitomized Section 1(15): "[Section] 15 gives the Commission, when shortage of equipment, congestion of traffic, or other emergency requires action in any section of the country, authority to suspend its rules as to car service, and to make such reasonable rules with regard to it as in the Commission's opinion will best promote the service in the interest of the public and the commerce of the people, and to give direction for performance or priority in transportation or movement of traffic." United States v. Koenig Coal Co., 270 U.S. 512, 515, 46 S.Ct. 392, 393, 70 L.Ed. 709. The Court thus clearly indicated that "rules, regulations and practices" in clause (a) and "directions" in clause (b) mean simply "rules" in its view.

[2] Miller & Co. v. Georgia Railroad & Banking Co., 1891, 88 Ga. 563, 15 S.E. 316, 18 L.R.A. 323, 30 Am.St.Rep. 170; Norfolk & W. R. Co. v. Adams, Clement & Co., 1894, 90 Va. 393, 18 S.E. 673, 22 L.R.A. 530, 44 Am.St.Rep. 916.

[3] Kansas Railroad Commissioners' Report 1891, page 22, quoted in 22 L.R.A., footnote on page 532.

murrage charge in view of a state statute which forbade a railroad to charge any fee or commission "other than the regular transportation fees, storage, and other charges authorized by law." The official report of the matter says:

"The company had made a rule, of which plaintiffs had notice, that a charge of $1 per car per day would be made for every detention of a car for the purpose of loading or unloading beyond seventy-two hours from the time that the car was placed at the disposal of the shipper or consignee, as the case might be."

The court said:

"It [the demurrage charge] is neither a transportation charge, nor a storage charge, nor a terminal charge, nor a subterfuge for adding to the cost of transportation in excess of the rates prescribed."

The court sustained the charge on the ground that after allowance of a reasonable time for unloading, the railroad "can make reasonable rules and regulations and charges for such service as bailee, as it may see fit," and said, "Such charges are not carrier charges in the meaning, intendment, or prescription of the statute." [4]

Thus, the original support for the right of a railroad to impose a demurrage charge was that such charge constituted a reasonable rule and regulation in respect to the use of the car, the purpose being to prevent delay in loading and unloading.

The Interstate Commerce Commission early referred to demurrage charges as car-service rules. For example, in Cudahy Packing Co. v. Chicago & Northwestern Ry. Co., 1907, 12 I.C.C. 446, it said, "The car-service rules of the defendant provide for a demurrage charge of $1 per day if cars are not unloaded within forty-eight hours," and repeatedly used the expression "car-service rules" throughout that report.[5]

The demurrage charges of the railroads and the enactments by the several states in respect to them were so conflicting that in 1908 the National Association of Railway Commissions appointed a committee which drafted a Uniform Demurrage Code, which was approved by the Interstate Commerce Commission in December, 1909. The recited primary purposes of this Code were to promote the prompt release of cars and to prevent unreasonable detention of equipment. While this Code has been amended from time to time, it is still in effect, the latest general publication being December 28, 1944. As now published, it is entitled "Freight Tariff No. 4–Y, Naming Car Demurrage Rules and Charges—Storage Rules and Charges." Section 1 of this publication contains "Demurrage Rules and Charges" and covers many subjects under that heading. Rule No. 1 specifies the cars subject to the rules; Rule No. 2 describes the free time allowed; Rule No. 3 prescribes the method for computing time; Rule No. 4 provides for notification of arrival of cars; Rule No. 5 prescribes the placing of cars for unloading; Rule No. 6 prescribes the placing of cars for loading; Rule No. 7 prescribes the demurrage charges; Rule No. 8 prescribes the method of refunds for certain causes, and Rule No. 9 provides for average agreements. Thus, demurrage charges are an integral part of the demurrage rules as published and used in the industry. Orders of the Commission relating to demurrage have always been entitled "service orders" and, when issued, are, by direction of the Commission, served upon the Car Service Division of the Association of American Railroads, as agent of the railroads subscribing to the car service and per diem agreement.

During World War I, when the country was faced with an emergency in freight car service, the Director General of Railroads directed the publication of demurrage charges at the rate of $3 for the first day and an increase of $1 per day for each succeeding day until a maximum of $10 per day was reached. This action was attacked on the ground that the increased charges were penalties and that the Director General had no power to impose penalties. The Commission sustained the Director General.[6] Later, the Director General established a demurrage charge on lumber of $10 per car per day on cars held for reconsignment beyond forty-eight hours. The schedule stated that it was to prevent undue detention of equipment under the then present emergency. This charge was published in the uniform demurrage tariff. This action of the Direc-

4 Norfolk & W. R. Co. v. Adams, Clement & Co., supra note 2.

5 See Investigation and Suspension Dockets 83 and 83-A, 1912, 25 I.C.C. 314.

6 Lowry Lumber Co. v. Director General, 58 I.C.C. 113.

tor General was attacked, again on the ground that he had no authority to establish a penalty. The Commission said:

"We are of opinion that the Director General was authorized to inaugurate any reasonable and just regulation and practice which he might find necessary to eliminate the abuse of excessive and unreasonable detention of freight cars." [7]

This action and decision were brought before the courts in Turner, Dennis & Lowry Lumber Co. v. Chicago, M. & St. P. R. Co., D.C., 2 F.2d 291, 271 U.S. 259, 46 S.Ct. 530, 531, 70 L.Ed. 934. In the course of its opinion on the matter, the Supreme Court said:

"The efficient use of freight cars is an essential of an adequate transportation system. To secure it, broad powers are conferred upon the Commission. [Citing cases.] One cause of undue detention is lack of promptness in loading at the point of origin, or in unloading at the point of destination. Another cause is diversion of the car from its primary use as an instrument of transportation by employing it as a place of storage, either at destination or at reconsignment points, for a long period while seeking a market for the goods stored therein. To permit a shipper so to use freight cars is obviously beyond the ordinary duties of a carrier. The right to assess charges for undue detention existed at common law. Now, they are subject, like other freight charges, to regulation by the Commission. Demurrage charges are thus published as a part of the tariffs filed pursuant to the statutes.

"All demurrage charges have a double purpose. One is to secure compensation for the use of the car and of the track which it occupies. The other is to promote car efficiency by providing a deterrent against undue detention. [Citing cases.] The charge here in question, although called a penalty, is in essence an additional demurrage charge, increasing at a step rate. Such additional charges increasing with the length of the period of detention were introduced in respect to some cars by the National Car Demurrage Rules. See Rule 7, Demurrage Charges, sections A and B. They were widely applied while the railroads were under federal control."

The Court further said:

"The further contentions are that there was a denial of due process of law because the so-called penalty was imposed without notice; and that there was a denial of equal protection of the laws, because the charge was applicable only to cars loaded with lumber. The demurrage charge is, however, a tariff provision and not a penal law, and thus, the tariff duly filed charges the shipper with the requisite notice. And neither the Constitution nor the rule of reason requires that either freight or demurrage charges or the reconsignment privilege shall be the same for all commodities. We find no reason to disturb the basis of the Commission's classification."

The Supreme Court has considered the nature of demurrage charges in Swift & Co. v. Hocking Valley R. Co., 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722, and in Pennsylvania R. Co. v. Kittaning I. & S. Mfg. Co., 253 U.S. 319, 40 S.Ct. 532, 533, 64 L.Ed. 928. In the latter case, the Court remarked:

"The purpose of demurrage charges is to promote car efficiency by penalizing undue detention of cars. The duty of loading and of unloading carload shipments rests upon the shipper or consignee. To this end he is entitled to detain the car a reasonable time without any payment in addition to the published freight rate. The aim of the Code [the Uniform Demurrage Code] was to prescribe rules, to be applied uniformly throughout the country, by which it might be determined what detention is to be deemed reasonable."

■ From the foregoing it seems clear that demurrage charges are in part compensation and in part penalty; that in full character they are neither, not being rates as that term is used in connection with rate-making, nor penalties as that term is used in respect to penal impositions. They are sui generis. Historically, textually, in purpose and in content, they are an integral part of the established rules and regulations relating to the use and movement of cars. From the beginning they have been sustained as rules and regulations. They could not have been sustained as carrier charges or as penalties. As an integral part of the rules and regulations in respect to car service, they fall within the provisions of Section 1(15) of the Interstate Commerce Act. It follows that when an emergency exists, the Commission can, without hearing, issue, effec-

[7] American Wholesale Lumber Asso. v. Director General, 66 I.C.C. 393, 396.

tive for a limited time, orders in respect to these charges.

Appellants argue that demurrage charges are "rates, fares, and charges for transportation" and that the term "rules, regulations, or practices" has no relation to the fixing of rates, fares or charges. They cite Lehigh Valley R. Co. v. U. S., 1911, 3 Cir., 188 F. 879. That case holds that demurrage charges must be filed with the Commission and, when filed, must be observed as filed. But the section of the statute there relied on (Section 6 of the act of 1887, as amended 49 U.S.C.A. § 6, requires that the filed schedules shall include "all other charges which the Commission may require," and "any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges." It seems to us that the argument of plaintiffs in this respect is a nonsequitur, and, further, that the case cited does not support the point made. If a published rule or regulation affects or determines a charge, it is nevertheless a rule or regulation.

■ The further point is made by the plaintiffs that these orders of the Commission are invalid because thirty days notice was not given to the Price Administrator, as the designated agency of the President under the provisions of Section 1 of the Stabilization Act of 1942.[8] That statute provides in part:

"That no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase."

Although the Price Administrator, on his own behalf and on behalf of the Stabilization Director, originally petitioned to intervene as a party plaintiff in this case, he later withdrew his petition, stating, "Conversely, if this court should hold that the Commission may direct an increase in a demurrage charge without following the usual procedure provided for increases of rates or charges, the notice provision of the Stabilization Act would not be applicable." This obviously must be so, because if the Commission directs an increase in demur-

rage charges without notice and without hearing, the carriers, being without notice themselves, could not give the Price Administrator notice, and, there being no hearing, there would be no proceeding in which intervention could be had. The statute could not be held to direct an impossible act. Moreover, it would require clear language in the statute to persuade us that Congress intended to nullify an existing emergency power granted the Commission solely in the public interest and effective only for limited times of public necessity.

■ In argument plaintiffs contend that the service orders here involved are invalid because made applicable to intrastate as well as to interstate commerce. The complaint contains no averment as to intrastate traffic, but, on the contrary, the averments are that plaintiffs, including the intervening plaintiff, and their members are engaged in interstate and foreign commerce, and in business over the lines of railroads operating in accordance with the provisions of the Interstate Commerce Act. We need not, therefore, consider the point.

■ Plaintiffs averred that it would have been impossible to unload cars on certain days during the Christmas holidays. The labor situation in that respect was of such common knowledge that we took judicial notice of it in passing upon the application for a temporary restraining order. In passing upon the motions to dismiss and the cross motions for summary judgment, the averments of the complaint must be accepted as facts. Upon that premise it appears that the orders could not, in respect to those days, accomplish any part of their sole objective, i.e., the unloading of cars. Their only result, so far as those days are concerned, would be to cause payments to be made to the railroads by shippers. We think that emergency orders with that sole result are arbitrary. We, therefore, sustain as part of the judgment upon the motions for summary judgment the provisions of the temporary restraining order. So much of the orders of the Commission as provide for the exclusion from free time of Sunday, Monday, and Tuesday, December 23, 24, and 25, 1945, Sunday, December 30, 1945, and Tuesday, January 1, 1946, will be set aside and enjoined.

Orders will be drawn in accordance with the foregoing opinion.

---

[8] Act of October 2, 1942, 56 Stat. 765, 50 U.S.C.A.Appendix § 961.