**ARMOUR & CO. v. LOUISIANA SOUTH-
ERN RY. CO.**

No. 13418.

United States Court of Appeals
Fifth Circuit.

Aug. 4, 1951.

Borah, Circuit Judge, dissented.

Harry McCall, Jr., New Orleans, La., Paul E. Blanchard, Chicago, Ill., Chaffe, McCall, Toler & Phillips, New Orleans, La., for appellant.

Henry B. Curtis, New Orleans, La., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and RUSSELL, Circuit Judges.

RUSSELL, Circuit Judge.

This is an appeal by the defendant from a summary judgment entered in favor of the plaintiff. The action was brought by the appellee railway company to collect from the appellant, Armour and Company, demurrage charges at the rate stated and prescribed by the Interstate Commerce Commission in its Service Order No. 775.

The demurrage charges prescribed by the Commission were greater than those set up and published in the tariff of the railway company. The appellant defended upon the ground, which is likewise urged here, that the demurrage rates as set forth in the railway company's published tariff schedule, on file with the Interstate Commerce Commission, conclusively evidenced the extent and amount of permissible recovery since the carrier had failed to publish the changed rates as a supplement to its tariff. The railway company contends that it is entitled to, and must, recover demurrage at the rates prescribed by Service Order No. 775, which had been issued prior to the time during which the demurrage charges accrued.

By Service Order No. 775, the Interstate Commerce Commission, purporting to act under the provisions of the Interstate Commerce Act 49 U.S.C.A. § 1 (10)–(17), and particularly sub-section 15[1] thereof, found that railroad freight cars were being delayed so unduly in loading and unloading, et cetera, as to cause a shortage of equipment and to impede the use, movement, et cetera, of such cars and thereby create an emergency requiring immediate action in all sections of the country. The Commission prescribed a shorter period of free time and higher charges, increasing at a daily step rate for "demurrage on railroad freight cars." The provision was ordered to become effective on October 15, 1947, but to expire on May 1st, 1948, unless otherwise modified or changed by the Commission. Sub-section (f) of the order provided: "Tariff provisions suspended * * the operation of all rules, regulations or charges, insofar as they conflict with the provisions of this section, is hereby suspended." Sub-section (g) directed "Announcement of Suspension" as follows: "Each railroad, or its agent, shall publish, file and post a supplement to each of its tariffs affected thereby, in substantial accordance with the provisions of Rule 9 (k) of the Commission's Tariff Circular No. 20 * * * announcing the suspension of the operation of any of the conflicting provisions therein, and establishing the substituted provisions set forth herein." Provision was also made for service of the order upon the agent of the railroad and for notice to the general public by filing with the Director, Division of the Federal Register. The railway company did not, prior to the period during which the demurrage charges accrued, comply with the provisions of the order requiring publication and posting of a supplement to its tariff schedule.

The trial Court awarded judgment in favor of the plaintiff in the sum of $5,-801.40,—the demurrage charges computed in accordance with Service Order No. 775. Appellant here insists that the plaintiff carrier may not lawfully assess and collect demurrage charges greater than those specified in its duly filed and published tariff. In specification of errors it insists that the trial Court erred in failing to hold as a matter of law: (1) that demurrage charges are transportation charges within the definition of that term as used in the Interstate Commerce Act[2] for which appellee could charge only the amounts specified in its duly filed published and effective tariff; (2) that appellee's tariff could not be amended by the mere issuance of an order of the Commission directing the carriers to amend it; (3) that the said order of the Commission, on its face, did not amend, and made no attempt to amend, appellee's effective tariff.

---

1. "par. (15) Powers of commission in case of emergency. Whenever the commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the commission may determine: (a) to suspend the operation of any or all rules, regulations, or practices then established with respect to car service for such time as may be determined by the commission; * * *."

2. 49 U.S.C.A. § 1, et seq.

The appellee, on the other hand, contends that the service order issued by the Commission in the exercise of its emergency powers as set forth in Section 1 (15) of the Act is a valid order having the force and effect of law, and that the demurrage charge prescribed therein must be observed.

While the appellant's argument in support of its position is based upon various grounds, they all reach the one ultimate point that since demurrage charges are charges for transportation or service and are required by law to be filed and published, and since no deviation from such a tariff is legally permissible, the rates fixed by such a tariff are controlling as published and are unaffected by any attempt of the Interstate Commerce Commission by the promulgation of a car service order to prescribe other and different rates of demurrage charges. It is argued that a tariff rate, once published and in effect can be cancelled and made ineffective only by the publication and filing of another schedule, and that while in effect the requirement of the statute to collect the rate as published is superior to every other requirement even though in violation of orders of the Commission. Thus is presented what we deem to be the real question in the case. That is whether the Interstate Commerce Act, as amended, and particularly the provisions of Section 1 (15) thereof, authorizes the Commission, in the discharge of its powers in case of emergency of railroad freight car shortage, to prescribe and fix demurrage rates, and suspend those theretofore in effect, so that such provisions and rates thereby become effective even if a carrier disobeys the Commission's order to publish the announcement of its suspension of rates theretofore in effect.

It is true that demurrage charges are considered and dealt with, by statute and decision as constituting a charge for transportation so as to generally come within the terms of Section 6 of the Interstate Commerce Act, supra, and thus properly includible in the tariff schedule. But the fixing of such charges for the detention of freight cars is also clearly one effective means of relieving a shortage of railroad freight cars by inducing speed in the loading and unloading of them, and the provisions of Section 6 are therefore not repugnant to, or inconsistent with, the grant to the Commission of emergency powers as provided in Section 1 (15), supra. Furthermore, section 6 contemplates a legal schedule and thus makes definite the measure of charges which may be lawfully demanded or received. However, it is clear from other provisions of the Act that in final analysis the Interstate Commerce Commission has the controlling word in the fixing of rates. When the Commission has thus spoken, the carrier is forbidden to thereafter "publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so *prescribed* [3] * * *." (Emphasis supplied). 49 U.S.C.A. § 15 (1); State of New York v. United States, 331 U.S. 284, 340, 343, 345, 67 S.Ct. 1207, 91 L.Ed. 1492. In this matter of rates, when the Commission acts, it is the creator and the tariff schedule the creature. It is in this sense that Section 6 (3) (7) of the Interstate Commerce Act make fully binding the provisions of the tariff schedule, but these provisions nevertheless contemplate compliance with the valid orders of the Commission. Cf. Lowden v. Simonds, etc., Grain Co., 306 U.S. 516, 521, 59 S.Ct. 612, 83 L.Ed. 953; Davis v. Portland Seed Co., 264 U.S. 403, 44 S.Ct. 380, 68 L.Ed. 762; Arizona Grocery Co. v. Atchison, T. & S. F. Ry., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348. Among the purposes of the Interstate Commerce Act is the prevention of discrimination and preference. It does not at all comport with this purpose to employ the provisions of Section 6, supra,

3. It is true, of course, that this section contemplates fixing of rates after a hearing rather than without a hearing, as is provided by Section 1, paragraph 15, stating the powers of the Commission in case of emergency. However, this in no way weakens the effect of this and the cognate sections in demonstrating that the Commission has final authority as to prescribing rates, and that any printed schedule contrary to the orders of the Commission is not effective.

as a means of permitting a carrier or shipper to evade a lawful charge prescribed by the Interstate Commerce Commission by failing to comply with an order of the Commission to publish the rate which it had authorized or fixed. That section must be applied in the light of the principal, fundamental and essential in any system of government by law, that every enactment conclusively assumes obedience not to its terms considered only as isolated language, but also in connection with all other pertinent provisions of the law. So when the section refers to "printed schedule" the entire picture presented is a schedule approved, authorized and promulgated in accordance with law and not one which is contrary to law. Valid orders of the Interstate Commerce Commission have the force of law. Avent v. United States, 266 U.S. 127, 45 S.Ct. 34, 69 L.Ed. 202; United States v. Michigan Portland Cement Co., 270 U.S. 521, 46 S.Ct. 395, 70 L.Ed. 713; Turner, D. & L. Lumber Co. v. Chicago, Milwaukee & St. Paul Railway Co., 271 U.S. 259, 46 S.Ct. 530, 70 L.Ed. 934.

We therefore consider the scope of power granted the Interstate Commerce Commission by the provisions of Section 1 (15) of the Act. This in turn depends upon whether the fixing of demurrage rates by a service order such as that now under consideration, in case of emergency requiring immediate action, is properly included in the grant of power "to suspend * * * all rules, regulations, or practices then established with respect to car service for such time as may be determined by the commission". In the issuance of the order now in question the Commission, citing the statute, supra, determined that it had such power.[4] If the Commission was empowered by the statute to suspend the demurrage charges theretofore in effect and direct new ones to be charged, it would follow that the failure of the carrier to comply with the direction for announcement and establishment of the increased demurrage charges

could not annul the validity of the suspension of the old charges and the establishment of the new. The existence of the emergency is not questioned. The real question is whether such an order relates to "rules, regulations and practices." The subject has received full consideration by a statutory three-judge Court in Iversen v. United States, D.C., 63 F.Supp. 1001, in which Circuit Judge Prettyman, delivering the opinion of the Court, reviewed the nature of demurrage charges in the light of the authorities and held that the power to fix them was granted the Commission by the terms of Section 1 (15) of the Interstate Commerce Act, supra. The case was affirmed by the Supreme Court, 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998. There is no occasion for reiteration here of the views there expressed further than to evidence our approval of the conclusion there that the quoted and referred to provisions of Section 1 (15), supra, authorized the Commission to issue Service Order No. 775 here in question. See also Chicago, M., St. P. & P. R. Co., v. McCree & Co., D.C., 91 F.Supp. 57, holding to the same effect with reference to Service Order No. 775.

As a valid order of the Interstate Commerce Commission superseded and effectively suspended tariff provisions theretofore in effect, and likewise validly established the new demurrage charges from which the recovery sought and allowed in the present case was computed, the failure of the carrier to comply with the order of the Commission that it give notice of such suspension and fixing of new demurrage charges did not, and could not legally annul the Commission's order. The trial Court did not err in so adjudging and its judgment is affirmed.

Judgment affirmed.

BORAH, Circuit Judge (dissenting).

I find it impossible to agree with this decision. I am aware of no authority which

4. We are told by the appellee's brief that "since the passage of the Esch Car Service Act in 1917 during World War I the Commission in nearly 900 instances ex- ercising the emergency powers thus conferred upon it, has issued Car Service Orders."

even remotely suggests that a tariff rate or charge, once published and in effect, can be set aside or changed in any way save by the one method provided by the statute.[1] That method is by publishing a new tariff or tariff supplement, naming the new rate to be charged. Under Section 6(7) the carrier may not charge, or demand, or collect, or receive greater, or less, or different compensation than the rates which are specified in the tariffs filed and in effect at the time. The legal rate is the *filed* rate and it is the duty of the carrier to charge and collect the rate precisely as same is contained in the tariffs on file with the Commission and this is so even though such rate be excessive, unreasonable and unlawful. The order of the Commission to publish and file a new tariff naming the new and changed charges for detention of cars, though valid, was not self executing and did not *ipso facto* cancel the published rate on file. If, as here, the order of the Commission is not promptly obeyed by changing the tariff as provided in Section 6, then, as I understand the authorities, the uncancelled tariff stands and must be applied until something else is done to enforce the order. The Commission has the power to compel obedience under Section 16(12) and I am not persuaded to believe that such orders are self executing. The fact that the Commission's order was issued pursuant to the emergency powers granted it under Section 1(15) is not material. Furthermore, the order here involved shows a recognition on the part of the Commission that the rate change was to be accomplished by the only method provided by the Statute, that is a suspension of charges in the existing tariff and the publication of new charges in a new tariff. If the Commission could by its own *ipse dixit* change an established tariff rate without complying with the requirements of the Statute, then why was there necessity or

need for spelling out in detail that the supplemental tariffs were to be published in substantial compliance with the Commission's own tariff circular? For these reasons I respectfully dissent.

1. Section 6(3) of the Act provides: "No change shall be made in the rates * * * which have been filed and published by any common carrier in compliance with the requirements of this section, except after * * * notice * * * to the public * * * which shall plainly state the changes proposed to be made in the schedule then in force * * * and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time * * *."